JOSEPH W. COTCHETT, Cal. Bar No. 36324
THOMAS E. LOESER, Cal. Bar No. 202724
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcom Road
Burlingame, CA 94010
Tel: 650-697-6000
Fax: 650-697-0577
jcotchett@cpmlegal.com
tloeser@cpmlegal.com

AND

KARIN B. SWOPE (*pro hac vice* to be filed)
JACOB M. ALHADEFF (*pro hac vice* to be
filed)
**COTCHETT, PITRE & McCARTHY LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272
Facsimile: (206) 299-4184
kswope@cpmlegal.com
jalhadeff@cpmlegal.com

Mark S. Reich (*pro hac vice* pending)
Michael N. Pollack (*pro hac vice* pending)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, Floor 17
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
mreich@zlk.com
mpollack@zlk.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| JACOB BURNS, JONATHAN MOULTON, AND STEVEN ZOU, on Behalf of Themselves and All Others Similarly Situated,<br><br>                       Plaintiffs,<br>v.<br><br>NZXT, INC. & FRAGILE, INC.<br><br>                     Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    PARTIES ...............................................................................................................4

    A.   Plaintiffs .........................................................................................................4

    B.   Defendants .......................................................................................................6

III.   JURISDICTION AND VENUE .............................................................................6

IV.    FACTUAL ALLEGATIONS .................................................................................7

    A.   The Program .....................................................................................................7

      1.   Defendants' Player PCs ..............................................................................8

      2.   Program Hardware Specifications and Benchmarks....................................9

      3.   Defendants' Flex Program & False Advertising.......................................15

      4.   Defendants' Misrepresentations...............................................................16

      5.   Defendants Targeted Minors....................................................................26

      6.   Defendants' Representations And "Buy-Out" Clause Violated the Karnette Rental Purchase Act.................................................................27

      7.   Defendants' Debt Collection Practices ....................................................31

      8.   Defendants Admit Wrongdoing................................................................33

      9.   Defendants Worked Together To Further Their Fraudulent Bait-and Switch Scheme 35

      10.  The Enterprise's Use of Mails and Wires ................................................43

V.     CLASS ACTION ALLEGATIONS ......................................................................45

VI.    CAUSES OF ACTION .........................................................................................49

    COUNT ONE ...........................................................................................................49

    COUNT TWO ...........................................................................................................56

    COUNT THREE ........................................................................................................57

    COUNT FOUR ..........................................................................................................60

    COUNT FIVE ............................................................................................................60

    COUNT SIX ..............................................................................................................63

    COUNT SEVEN ........................................................................................................66

    COUNT EIGHT .........................................................................................................68

    COUNT NINE ...........................................................................................................71

    COUNT TEN .............................................................................................................73

    COUNT ELEVEN .....................................................................................................74

    COUNT TWELVE ....................................................................................................76

    COUNT THIRTEEN .................................................................................................77

Class Action Complaint – Case No.

COUNT FOURTEEN ................................................................................................. 79

PRAYER FOR RELIEF ............................................................................................. 80

DEMAND FOR TRIAL BY JURY .............................................................................. 80

Class Action Complaint – Case No.

Plaintiffs Jacob Burns, Jonathan Moulton, and Steven Zou ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against NZXT Inc., ("NZXT") and Fragile Inc. ("Fragile") (collectively "Defendants"). NZXT owns and operates the website and the subdomains at https://nzxt.com (the "Website"). NZXT falsely advertised and sold the NZXT PC Flex Program (the "Flex Program" or "Program") in conjunction with Fragile. Plaintiffs allege the following upon information and belief based on the investigation of counsel, including the investigations of Gamers Nexus[1] and JayzTwoCents, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## I.    INTRODUCTION

1.      NZXT and Fragile conspired to defraud consumers through gross misrepresentations and illegal business practices.

2.      NZXT is a computer hardware manufacturer that specializes in high-end gaming PCs. Aside from selling PCs and PC parts, NZXT also provides rental-based PC hardware under NZXT's PC Flex Program.

3.      To provide the Flex Program, NZXT partnered with Fragile, a debt collection and payment services company that administers and manages the Program. In coordinating the Flex

---

[1] The core allegations first came to light after an independent investigation by Gamers Nexus, which led to the CEO of NZXT making responsive videos and publishing interviews about these issues., Jacob Fox, *I Want to Acknowledge that We Messed Up': NZXT Addresses Concerns about Its Controversial Flex Gaming PC Rental Program and Commits to Taking Action*, PC GAMER (Dec. 5, 2024) https://www.pcgamer.com/hardware/gaming-pcs/i-want-to-acknowledge-that-we-messed-up-nzxt-addresses-concerns-about-its-controversial-flex-gaming-pc-rental-program-and-commits-to-taking-action/ (last visited January 8, 2025). The full investigation can be found at: Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0

Class Action Complaint – Case No.

Program, NZXT supplies and markets the PC hardware, while its partner Fragile purchases that hardware, administers the Program and processes payment.[2] NZXT and Fragile associated to create a criminal enterprise that defrauded consumers in Defendants' Program (the "Enterprise").

4.     Defendants conspired to defraud NZXT's rental customers (the "Lessees") through false representations and material omissions about the Program and the rights and obligations created through the Program. Defendants explicitly entered into an agreement and formed the Enterprise to intentionally commit fraud against consumers and execute a bait-and-switch scheme through the use of the mails and wires. Defendants knowingly disseminated grossly misleading advertisements and communications regarding the nature of the Program and the specifications, components, and attributes of the leased PCs.

5.     Defendants directly, and through their advertisers, stated that the Program had "no contracts," required "no commitment," and had "zero strings attached."[3] Defendants advertised that the Program provided consumers with a "lifetime warranty."[4] Defendants advertised that Lessees had the right to own the PC while requiring monthly payments, indicating the Program was a rent-to-own agreement. None of this was true. Through deceptive tactics and fraud, Defendants induced Lessees to join the Program and sign onerous, unclear, contradictory, and illegal leases.

---

[2] *See* JayzTwoCents, *Confronting NZXT's CEO about the Flex Program*, YouTube (Dec. 5, 2024), https://www.youtube.com/watch?v=8qqeMWrrxMc (Last Visited Apr. 23, 2025).

[3] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 1:44 and 20:38.

[4] *Id.* at 26:07/1:06:28

Class Action Complaint – Case No.

6.      As a part of that deception, Defendants repeatedly promised new and premium computer hardware while knowingly delivering used and inferior components. To illustrate, Defendants advertised a pre-assembled Player: Three PC, containing an NVIDIA RTX 4090 graphics card (retail value: $1599.99),[5] but switched Plaintiff Burns' graphics card to an NVIDIA RTX 4080 Super (retail value: $999.99)[6] when he rented a Player: Three PC—resulting in a 37% downgrade in value and a substantial downgrade in performance for his rented Player: Three PC. Defendants' pattern of misrepresentations extended across multiple Player PC specifications, which overpromised and underdelivered on the material performance, functionality, and quality of the rented Player PCs.

7.      Defendants deliberately obscured their fraud through unclear and contradictory representations. Defendants did so while frequently changing pricing, components, and hardware configurations, such that a Lessee could not reasonably discover whether their rented PCs contained inferior parts.

8.      Defendants paid social media influencers to further disseminate their lies and misrepresentations, and Defendants targeted minors and vulnerable populations by advertising that users should convince their parents to pay for the Program.

9.      Through a campaign of deception and material omission, Defendants secured economic gain at the direct expense of Plaintiffs and the Class.

10.     Plaintiffs are among at least thousands of Lessees who were defrauded by Defendants.

---

[5] *See* https://www.nvidia.com/en-us/geforce/graphics-cards/40-series/rtx-4090/
[6] *See* https://www.nvidia.com/en-us/geforce/graphics-cards/40-series/rtx-4080-family/

Class Action Complaint – Case No.

3

11.    As detailed below, Plaintiffs and Class members are entitled to compensatory, consequential, statutory, punitive, general, nominal, and treble damages, disgorgement and restitution, and injunctive relief.

## II.    PARTIES

### A.    Plaintiffs

12.    Plaintiff Jacob Burns is a citizen and resident of the State of Washington, currently residing in Vancouver, Washington. Plaintiff Burns signed up for NZXT Flex in November 2024, receiving the Player: Three Prime for $259.00 per month, which was explicitly advertised to include an RTX 4090 graphics card. The PC Plaintiff Burns received did not function. Burns returned the PC for repairs. The subsequent PC Plaintiff Burns received included an RTX 4080 Super graphics card, which is substantially less valuable than the RTX 4090 he was originally promised and paid for. Defendants provided no reasonable explanation for this downgrade and continued to charge Plaintiff Burns the higher amount even after promising Plaintiff that his monthly rate would be lowered due to the substantial decrease in PC performance. Soon after receiving the replacement PC, the NZXT Kraken Elite CPU Cooler broke leaving Plaintiff Burns, once again, with a non-functional PC. In communications with Fragile customer service, Plaintiff Burns was promised a new Kraken Elite CPU Cooler but instead received an obviously preowned unit with dried thermal paste on the contacts and loose wires. Fragile assured Plaintiff Burns that he should install the CPU Cooler, but installation caused major damage to the PC, resulting in all fan headers becoming completely unresponsive. Plaintiff Burns again had a non-functioning and under-spec Player: Three Prime PC. Plaintiff Burns was charged for several months of the Program while he did not in fact have a working PC as Defendants repeatedly provided broken, used, or subpar PCs and components. Plaintiff Burns saw paid promotions that reasonably led him to believe that he would own the PC. Plaintiff Burns would not have leased the Player 3

Prime had he known he would receive a substantially deficient PC and had he known of the Enterprise and scheme perpetrated by Defendants.

13.    Plaintiff Jonathan Moulton is a citizen of New York. When signing up for the Program in late 2024, he got a promotional rate of $50 for the first month and then paid $169.99 per month after that. Plaintiff Moulton paid using a debit card. He has a long-standing interest in building and modifying gaming PCs but was financially unable to do so until the Program was marketed to him. He sold off his PC parts and relied on a non-gaming laptop for school to save money to own his own PC again. Plaintiff Moulton saw advertisements about the Program via ads on social media, which he relied on when joining the Program. He joined the Program and believed he was entering a rent-to-own arrangement. Plaintiff Moulton leased the Player: Three PC. There were discrepancies in specifications between the prebuilt Player: Three offered for sale and the Player: Three leased through NZXT Flex. Plaintiff Moulton believed the Program consisted of a fixed 12-month or traditional rent-to-own plan. Plaintiff Moulton would not have participated in the Program had he known the true nature of the transaction or had he known of the Enterprise and scheme perpetrated by Defendants.

14.    Plaintiff Steven Zou is a citizen of California. He joined the Flex Program renting the Player: Three for $169.00 on October 30, 2024. Plaintiff Zou used the PC for his video editing work. Plaintiff Zou saw an advertisement on Instagram and was told the Program was a rent-to-own program where NZXT would sell Plaintiff Zou the computer at a discount. Upon renting the Player Three, a Fragile representative called Plaintiff Zou to discuss the Rental Program. Plaintiff Zou asked if the Program was a rent-to-own program. Defendants told Plaintiff Zou that it was possible that, after renting the PC, he could buy out the PC. Plaintiff Zou was told by the representative that he would have to call Defendants when he wanted to buy out the PC. Plaintiff

Class Action Complaint – Case No.

Zou chose to rent a PC and utilize the Program due to the rent-to-own option he was advertised and told about. Plaintiff Zou switched debit cards and forgot to update his payment card with Fragile. This prompted Fragile to call, text, and email him frequently. After switching autopay and updating the account and debit card, Plaintiff Zou paid the late fee and continued to make monthly payments. Plaintiff Zou would not have chosen to lease the PC had he known that he would not have the ability to rent-to-own or had he known of the Enterprise and scheme perpetrated by Defendants.

**B.    Defendants**

15.    NZXT, Inc. is a California-based company that assembles custom PCs and manufactures PC hardware components. NZXT distributes and markets these goods directly, via its own website and advertising, and indirectly, throughout the United States. NZXT works with Fragile Inc. to offer its fully assembled computers through the Flex Program. NZXT is headquartered at 605 E. Huntington Drive, Suite 213, Monrovia, CA 91016.

16.    Fragile, Inc. is a California-based company that is in the business of debt collection, payment solutions, and payment management for various technology hardware companies, including the Program operated in conjunction with NZXT. Fragile is headquartered at 2338 Market Street, San Francisco, CA 94114.

### III.    JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from a Defendant, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

Class Action Complaint – Case No.

18.    This Court has personal jurisdiction over Fragile, Inc. because Fragile has its principal headquarters in San Francisco, California, does business in California directly or through agents, and has sufficient minimum contacts with California such that it has intentionally availed itself of the laws of the United States and California.

19.    This Court has personal jurisdiction over NZXT, Inc. because NZXT has its principal headquarters in Monrovia, California, does business in California, directly or through agents, and has sufficient minimum contacts with California such that it has intentionally availed itself of the laws of the United States and California

20.    Venue is proper under 28 U.S.C. § 1391(a) through (d) because the Fragile Inc. headquarters and principal place of business are located in this District, Fragile resides in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Fragile's governance and management personnel.

## DIVISIONAL ASSIGNMENT

21.    Assignment to the San Jose Division of this Court is proper because Defendant Fragile's principal place of business is in San Francisco, California.

### IV.    FACTUAL ALLEGATIONS

**A.    The Program**

22.    NZXT has participated in the PC marketplace since 2004.[7]

23.    NZXT offers its products and services directly to consumers through its nzxt.com Website.[8] While NZXT initially manufactured and sold PC cases,[9] NZXT expanded its offerings

---

[7] *See* https://nzxt.com/about
[8] *See generally https://nzxt.com/*
[9] *See* https://www.anandtech.com/show/1287

7

Class Action Complaint – Case No.

to include fully built PCs and, by 2023, "unveiled a full revamp of its popular pre-built gaming rig line, now appropriately dubbed Player PCs."[10]

24.     NZXT advertises the Player PCs as containing the "latest components," including "the best" of "previous and current gen chipsets and graphics cards."[11] However, PC retailers "aim to clear the inventory of old models" when "new hardware releases[,]" but new hardware releases on a monthly or annual basis.[12] This means that a specific PC model will be discounted and sold to clear space for new models, containing new hardware on a regular basis.

25.     In July of 2024, NZXT partnered with Fragile to offer their PC leasing Program.[13]

**1.    Defendants' Player PCs**

26.     Until approximately December 6, 2024, NZXT's Player PC naming scheme was used for both purchased and leased PCs.

27.     NZXT's product names are meant to illustrate the comparative performance of their PC offerings, with *Player: One* models being inferior to, and cheaper than *Player: Two* models, and *Player: Two* models being inferior to, and cheaper than *Player: Three* models.

28.     Similarly, NZXT uses the "Prime" suffix to measure half-steps between the Player PC product lines: *Player: One* PCs are inferior to, and cheaper than, *Player: One Prime* models, which are inferior to, and cheaper than, *Player: Two* PCs.

---

[10] *See* https://www.forbes.com/sites/mitchwallace/2023/03/13/nzxt-launches-stunning-line-of-player-pre-built-gaming-pcs/

[11] *See* https://nzxt.com/category/gaming-pcs/prebuilt-pcs?srsltid=AfmBOopAV4QQQV17MmAUhGipYxJoqe8Dtzi3Tq06OqKNhSF8cTcxKdCA

[12] *See* https://www.ign.com/articles/the-best-time-to-buy-a-gaming-pc/

[13] *See* https://arstechnica.com/gadgets/2024/08/nzxt-wants-you-to-pay-up-to-169-month-to-rent-a-gaming-pc/

Class Action Complaint – Case No.

29.     To illustrate Defendants' confusing naming system for its PC leases, these are model specifications as of February 7, 2025, using Defendant's original nomenclature for both purchase and rental PCs:

- Player: One[14] ($59/month) features an Intel Core i5-12400F processor, NVIDIA GeForce RTX 3050 graphics card, 16GB DDR4 3200 MHz RAM, and a 500GB NVMe M.2 SSD
- Player: One Prime ($89/month) includes an Intel Core i5-13400F processor, NVIDIA GeForce RTX 4060 Ti graphics card, 16GB DDR5 5200 MHz RAM, and a 1TB NVMe M.2 SSD.
- Player: Two ($129/month) features an AMD Ryzen 5 5600X processor, NVIDIA GeForce RTX 4070 graphics card, 16GB DDR4 3200 MHz RAM, and a 1TB NVMe M.2 SSD.
- Player: Two Prime ($159/month) features an AMD Ryzen 7 7700X processor and NVIDIA GeForce RTX 4070 Ti SUPER graphics card. With 32GB (2 x 16GB) DDR5 5200 MHz RAM and a 1TB NVMe M.2 SSD.
- Player: Three ($179/month) features an Intel Core i7-13700KF processor, NVIDIA GeForce RTX 4070 Ti graphics card, 32GB DDR5 5600 MHz RAM, and a 1TB NVMe M.2 SSD.
- Player: Three Prime ($259/month) features an Intel Core i7-13700KF processor and NVIDIA GeForce RTX 4070 Ti graphics card, delivering exceptional speed and visual fidelity. With 32GB (2 x 16GB) DDR5 5600MHz RAM and a 1TB NVMe M.2 SSD.[15]

30.     Each move into a higher product segment implies a certain level of performance gain relative to other models being offered at the time.

**2.     Program Hardware Specifications and Benchmarks**

---

[14] After December 6, 2024, NZXT changed the name of rental PC models to "Flex" PCs, on the heels of the publication of the Gamers Nexus NZXT investigation. *See* https://nzxt.com/news/nzxt-update-addressing-your-concerns-about-the-flex-subscription-program?srsltid=AfmBOooaZrwuveZrsion9Pt5RjcuowULWNZQ8oVmxiqSkxAHII1-jp1p ("Unclear product names have caused confusion among gamers who are searching for the right solution to their needs (Purchase vs. Subscription). To address this: we will be changing the names of products offered through our Flex subscription, providing a very clear distinction between the two.")

[15] *See NZXT Flex*, NZXT , https://nzxt.com/collection/flex (last visited Feb. 7, 2025).

Class Action Complaint – Case No.

31.     On the Player PC Product page, consumers are presented with the following webpage:



*Figure 1: Player: One product webpage as of February 21, 2025.*

32.     On a Player PC product page, consumers can scroll down to view the computer's expected performance, specifications, and frames-per-second benchmarks for specific video games that allegedly correspond to the hardware configuration of the assembled computer displayed on that webpage, as illustrated below:

10

Class Action Complaint – Case No.

*Figure 2: Performance and Specifications of Player: One product as of February 21, 2025.*

33.     A higher frames per second ("FPS") implies stronger graphics processing matched with a strong processor.

34.     "The central processing unit (CPU) is responsible for calculating operations like physics, audio, netcode, positional data, and countless other systems in modern PC games. It also sends rendering instructions to the [GPU]."[16]

35.     The instructions provided by the CPU to the GPU contain everything the GPU "needs in order to know what to render, including shaders, textures, and other visual data."[17] Once the GPU executes those instructions, the GPU "renders" or generates the frame visible on a computer monitor.[18]

---

[16] *See How to Properly Balance Your Components*, Intel, https://www.intel.com/content/www/us/en/gaming/resources/what-is-bottlenecking-my-pc.html#:~:text=This%20means%20the%20GPU%20is,the%20limitations%20of%20the%20CPU (last visited January 8, 2025).

[17] *Id.*

[18] *Id.*

Class Action Complaint – Case No.

36.     If the GPU processes the instructions faster than the CPU can provide them, the GPU sits idle until the CPU catches up – meaning that fewer frames per second can be rendered.[19]

37.     In short, an inferior CPU can create a "bottleneck" on the GPU's ability to generate FPS.[20]

38.     The FPS metrics used by NZXT illustrate the effective performance of the paired CPUs and GPUs in the Player PCs, and are also indicative of the Player PC's performance during non-gaming applications, such as video editing and film production, which depend on adequate performance from both the computer's CPU and GPU.[21]

39.     Purchasers rely on FPS metrics as benchmarks for real-world video production, gaming, and other applications.

40.     Comparative FPS performance in standardized real-world benchmarks allow prospective purchasers to make informed purchasing decisions,[22] and a higher FPS implies better computer performance for gaming, video playback, and content creation, warranting higher prices for hardware that provide higher FPS.[23]

---

[19] *Id.*

[20] *Id.*

[21] *See DaVinci Resolve Systems Requirements and Benchmarks,* PUGET SYSTEMS, *https://www.pugetsystems.com/solutions/video-editing-workstations/davinci-resolve/hardware-recommendations/?srsltid=AfmBOorx_jtg-Z6Gr7ID41RSm0TapjiCVXHIUGnmGp_bKVnE2T68NbCg* (last visited January 8, 2025).

[22] *See* Sean Whaley, *What is Frame Rate and Why is it Important to PC Gaming*, HP (Nov. 20, 2018) https://www.hp.com/us-en/shop/tech-takes/what-is-frame-rate (last visited January 8, 2025).

[23] *See* Michael Klappenbach, *Understanding and Optimizing Video Game Frame Rates*, LIFEWIRE (Nov. 5, 2022) https://www.lifewire.com/optimizing-video-game-frame-rates-811784 (last visited January 8, 2025).

Class Action Complaint – Case No.

41.     Gaming experiences in particular demand high FPS for fluid motion and quick input response times, especially for fast-moving scenes.[24] A system running at 120 FPS or 144 FPS offers a significantly smoother experience compared to one running at 30 FPS or 60 FPS, which can result in lag and poor responsiveness.[25]

42.     Consumers can use the benchmarks provided by NZXT to pick the individual parts in the Player PCs that fit their budget and purpose, including CPU, GPU, and random access memory modules ("RAM"), as depicted below:



*Figure 3: Sample CPU parts selection for Player: Three Prime found at nzxt.com/product/player-three-prime.*

[24] *See* Vann Vicente, *How Do Frame Rates Affect the Gaming Experience*, HOW-TO GEEK (July 18, 2021) https://www.howtogeek.com/731943/how-do-frame-rates-affect-the-gaming-experience/ (last visited January 8, 2025).
[25] *See* Ural Garett, *How to Optimize your gaming PC for 60fps Performance*, TECHRADAR (Dec. 30, 2024) https://www.techradar.com/computing/how-to-optimize-your-gaming-pc-for-60fps-performance (last visited January 8, 2025).

Class Action Complaint – Case No.

43. Each time a consumer alters a part choice, the Website updates the benchmarks, as depicted below:



*Figure 4: Sample benchmark, replacing the Intel 14900KF CPU with the AMD 9800X3D CPU, for Player: Three Prime found at nzxt.com/product/player-three-prime.*

44. Plaintiffs relied on the FPS metrics provided by NZXT when leasing their Player PCs.

45. After determining their parts appropriate for their needs and budgets, consumers can choose to purchase the assembled computer outright or lease the assembled computers on a monthly basis through the Website, as depicted below:

Class Action Complaint – Case No.



*Figure 5: Website option to buy or subscribe Player: Three PC as of February 21, 2025.*

46.    Consumers may click the "Buy/Subscribe" button to alter the details on the Player PC Webpage.

47.    Until Gamers Nexus released its investigative report, clicking the "Subscribe" button did not alter the name of the Player PC or provide any apparent indication that the hardware had changed.

48.    However, clicking the Buy/Subscribe buttons *did* alter the parts within the Player PC being requested. But these changes were not highlighted or otherwise conveyed to Plaintiffs and NZXT customers. A customer would have no reason to suspect that changing between Buy and Subscribe would cause the components within a particular PC model to change.

### 3.    Defendants' Flex Program & False Advertising

49.    For those that choose to subscribe/lease, users are redirected to Fragile, Inc.'s website, where they must enter their phone number, agree to Fragile's Terms and Conditions for the Program, and, purportedly, upload a photo ID, as depicted below:

Class Action Complaint – Case No.



*Figure 6: Sample rental order form as of February 21, 2025.*

50.     When consumers chose to lease, there is a brief approval process, and, once approved, they become a Lessee. Payments are charged to Lessees monthly, and Fragile automatically processes these payments using the chosen payment method on file.

**4.     Defendants' Misrepresentations**

51.     Defendants advertised Player PCs with specific components that were of a certain quality, standard, and grade, but Lessees instead received materially and substantially inferior products.

52.     To demonstrate, one Program Lessee rented a Player: Three PC that Defendant advertised as containing an RTX 4090 graphics card (retail value: $1599.99) for sale, but leased

to the Lessee a Player: Three PC with an RTX 4080 Super (retail value: $999.99) during the same time period—a 37% downgrade in value and a substantial downgrade in performance.

53.     NZXT's website and product naming were deceptive in design as Defendants used the same model names across "buy" and "subscribe" options while knowingly providing inferior and lower-value components when the consumer "subscribed."

54.     Due to the website design, and the design of the "Buy/Subscribe" button used on the Website, Plaintiffs could not see the hardware specifications and benchmarks change when switching between "Buy" and "Subscribe" on the Website. As such, Plaintiffs reasonably believed that toggling the Buy/Subscribe button did not alter the hardware (and thus value and performance) of the Player PCs.[26] However, NZXT provided substantially inferior hardware within leased Player PCs compared to purchased Player PCs of the same model name[27] permitting NZXT to offload older and inferior inventory.

55.     Defendants at other times advertised Player PCs containing NVIDIA "Founders Edition" GPUs produced by NVIDIA itself, but shipped products to Lessees, including Plaintiffs, containing inferior versions of the GPU manufactured and assembled by parties other than NVIDIA.

---

[26] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 15:55.
[27] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 15:55.

Class Action Complaint – Case No.

56.     As detailed by the Gamers Nexus investigation and internal benchmarking, Lessees received Player PCs with hardware that resulted in 30% decrease in performance compared to purchased PCs.[28]

57.     To make matters worse, NZXT changed hardware specifications for Player PCs in the Program so frequently that Lessees were often presented with inaccurate information about the Player PC they were leasing.

58.     Even when Defendants accurately advertised the components in a Player PC, their benchmarks were regularly inaccurate and internally inconsistent. Defendants provided differing benchmarks for Player PCs containing identical hardware,[29] or identical benchmarks for substantially different hardware. Defendants' inaccurate benchmarks represented a more than 10% difference in performance and never to the benefit of consumers.[30] That is, Defendants regularly and consistently overstated the actual performance of the Player Pcs that they provided to consumers.

59.     Defendants' and their agents intended for their advertising to influence children as they suggested that minors, or those otherwise dependent on guardians, should "convince[e] [their] parents" to lease Player PCs on their behalf, as depicted below:

---

[28] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 13:38.

[29] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 16:04

[30] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 16:10

Class Action Complaint – Case No.





*Figure 7: Three consecutive screenshots from an influencer advertisement video aimed at minors, suggesting minors should convince parents into joining the Program.[31]*

---

[31] Courtesy of Gamers Nexus. Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 27:59.

Class Action Complaint – Case No.

60.     Defendants' and their agents promised younger, vulnerable, and less financially stable minors that the program had "no contracts," "no commitment," and had "zero strings attached." [32]

61.     Defendants' advertisements promised that the Program had "no strings attached" as depicted below:



*Figure 8: Defendants' agents stating the program has "no strings attached" and requiring no commitment.* [33]

62.     Defendants' advertisements claimed that the Program required no contracts at all.

---

[32] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 1:44 and 20:38.
[33] *Id.*

20

Class Action Complaint – Case No.



*Figure 9: Defendants' promotion claiming the Program rental does not require contracts.[34]*

63.    Defendants' advertisements promised that users were paying for a brand new PC.



*Figure 10: Defendants' promotion that was removed from the internet claiming that users "can now **own** and game on a PC starting at $59 a month with NZXT's new subscription Flex Program."*

64.    Defendants' paid content creator Kyle Oleary (@samsonjc22) to promote the Program stating:

Kyle Oleary:    "I just emptied my life savings building the gaming house and with us still needing 6 PC setups, I need to get a little creative. In order for us to buy three high end PCs and 3 mid tier PCs, we're looking

---

[34] *Id.*

Class Action Complaint – Case No.

at spending anywhere between $15,000 to $18,000, and that's not even including monitors, keyboards, and the peripherals.

And in order to afford our gaming addiction I've actually had to cut Quinn's salary down into the negative, so that means he's actually paying me to be part of this.

Quinn: Wait. What?

Kyle Oleary: Luckily not only did NZXT send us out their Play Three Prime to help finish out the gaming house, but they gave us a way to finish out our 6 PC setups without spending $18,000.

You can now own and game on a PC starting at $59 a month with NZXT's new subscription Flex Program.

And with new PC hardware coming out what feels like every other day, the new Flex Program allows you to trade in your PC and upgrade it every one to three years.

That means the gaming house will always have the highest end gaming PCs without breaking the bank.

Quinn: Does that mean I'll finally get paid?

Kyle Oleary: Quinn. No.

So the days of it being cheaper gaming on console are long gone. Make sure to check out the Flex Program on my page for switching from console to PC."[35]

65.    For these advertisements, Defendants paid influencers to promote the Program and supplied them with a list of specific talking points.

66.    Defendants did not amend these ads until confronted with their false claims.

---

[35] *Id.*

Class Action Complaint – Case No.



*Figure 11: NZXT's PC Flex checkout page stating "No commitment. Cancel and return anytime with no hidden fees."*

67.      NZXT markets and advertises the Program in conjunction with Fragile as "No commitment." Defendants' agents promised that "returning the PC is free" and that "there aren't any cancellation fees."[36] Advertisers working for Defendants claimed that Lessees "own" the leased PCs.[37] Defendants advertised a "lifetime warranty"[38] and that Lessees would receive a brand new computer and/or components.

68.      Confusingly, the sign-up-wrap agreement for the Program (the "Agreement") provides for a permissive "Buy Out" option. Under the "Buy-Out and Rent-to-Own" Section of the Agreement:

---

[36] *Id.* at 21:00/1:06:28
[37] Gamers Nexus, *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 21:18
[38] *Id.* at 26:07/1:06:28

Class Action Complaint – Case No.

This Subscription is not a rent-to-own program. At no point will Subscriber own the Rental Devices, or other Services, provided under this Subscription, even if Subscriber payments aggregate to more than the collective retail price for all Services.

If Subscriber seeks to purchase their Rental Device, and/or any other Services in connection with this Agreement, Operator may, but is not required to, extend Subscriber an option to purchase their Rental Device(s), and any additional Services which Operator chooses to include. Operator may provide a discount on such Rental Device(s) based on Operator's estimated value of such items, and other commercial considerations.

69.    While Defendants claim that program is not a "rent-to-own," Defendants' advertisements and agents told consumers that they would own their computer, and this permissive clause in Defendants' Agreement provides rent-to-own as a possibility to the contracting parties.

70.    NZXT markets this plan with statements suggesting consumers may cancel at any time without fees, and NZXT promises a "Lifetime Warranty." [39]



Figure 12 – advertising a Lifetime Warranty further implying leased PCs are new.[40]

71.    NZXT advertises that Program PCs have a "lifetime warranty," such that either the lifetime warranty claim is illusory, or the statement further implies that the consumer will have ownership over the computer.

---

[39] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 24:15
[40] *Id.* at 24:15

Class Action Complaint – Case No.

72.    Fragile binds users to a written contract at the time of finalizing the lease. Defendants' Agreement[41] includes return policies that create obligations directly contrary to Defendants' advertisements.

73.    In addition, the Agreement includes cancellation fees, directly contradicting Defendants' advertisements and representations.[42]



*Figure 13 – Defendants' representation of a $119.00 cancellation fee directly contradicting its advertisements that the program has no cancellation fees.[43]*

74.    The Agreement limited the time in which a Lessee can dispute erroneous charges to sixty (60) days, requiring consumers to give written notice. If no notice is given within that timeframe, the Lessee is deemed to accept the charge as valid.[44]

75.    NZXT and Fragile misrepresented nearly every aspect of the Program. Lessees in fact entered into contracts with Defendants, Lessees did not own the PCs, Defendants

---

[41] The term "Subscription Agreement" refers to the agreement between Lessees and NZXT/Fragile that was effective on March 7, 2023. It can be found here: https://web.archive.org/web/20240228085835/https://fragile.co/legal/subscription-agreement. Plaintiffs reserve all rights to challenge the validity of the Subscription Agreement at a later date.

[42] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 21:14

[43] *Id.*

[44] https://web.archive.org/web/20240228085835/https://fragile.co/legal/subscription-agreement

Class Action Complaint – Case No.

misrepresented their cancellation and return policies, Defendants provided no lifetime warranty, Defendants' contract did not provide an enforceable rent-to-own option, Defendants provided computers and components that were used rather than new, and Defendants provided Plaintiffs with PCs with substantially worse components than advertised and promised.

76. Defendants made many false and misleading statements through paid promotion on various social media channels and on Defendants' websites at least between July 2024 and December 2024. Defendants NZXT and Fragile fraudulently induced Plaintiffs and the class to enter into onerous and usurious rental agreements by falsely advertising the specifications, components, and performance of the rented PCs. Plaintiffs Burns, Moulton, and Zou were specifically influenced by Defendants' false advertising and would not have joined the program had they known that their PC would not contain the promised new components, would not meet promised performance metrics, or that Plaintiffs would not own the gaming PC.

**5.  Defendants Targeted Minors**

77. Defendants' Agreement requires that Lessees must be 18 to use the Program, noting "[b]y entering into this Agreement, Subscriber represents and warrants they (i) are at least eighteen (18) years of age."

78. However, Defendants expressly targeted minors as their advertisements stated that users should "convinc[e] your parents" as demonstrated in Figure 7.

79. Further, Defendants' ID verification process was ineffective and failed to require ID from Lessees signing up to the Program. On information and belief, the lack of ID verification may have resulted in children being able to enroll in the Program.

80. This failure in the verification process amplified the potential harm caused by Defendants actively targeting minors with advertising for the Program.

Class Action Complaint – Case No.

81.    Defendants' purported ID review process should have prevented minors from becoming Lessees, when working properly.

82.    However, Gamers Nexus' "anonymous buyer" investigation allowed them to lease a Player PC under a pseudonym, without providing identification, and was approved for the Program and sent a PC, as depicted below:



*Figure 14: Defendants approve Gamers Nexus' Rental under a fake name, even though no form of ID was submitted to either Defendant. [45]*

83.    Despite promises that Defendants secured their Program to prevent fraud and dealings with minors, Defendants did not deliver on its assurances and actively advertised the Program to children.

**6.    Defendants' Representations And "Buy-Out" Clause Violated the Karnette Rental Purchase Act**

84.    Defendants' representations and "Buy-Out and Rent-to-Own" clause is misleading and contradictory.

85.    NZXT's advertisements intimated that users would "own" the PC and generally that Program was rent-to-own. Plaintiffs and the Class reasonably believed that they would own

---

[45] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 28:55.

Class Action Complaint – Case No.

the PC. In communications with consumers, on information and belief, Fragile's representatives were trained to state that consumers could purchase the PC after renting the PC for a period.

86.     In contrast, Fragile's Agreement provides: "this Subscription is not a rent-to-own program."[46] However, Fragile later carves out the explicit possibility for Lessees to purchase the very hardware they have leased. "If Subscriber seeks to purchase their Rental Device, and/or any other Services in connection with this Agreement, Operator may, but is not required to, extend Subscriber an option to purchase their Rental Device(s)."[47]

87.     This "option to purchase" is vague and in the context of Defendants other advertisements and communications serves as a rent-to-own clause,[48] as Lessees pay recurring fees and were regularly informed that they would own the Flex PC.

88.     Defendants NZXT and Fragile fraudulently induced Plaintiffs and the class to enter into onerous and usurious rental agreements by falsely advertising that the Plaintiffs would own the PC. Defendants paid content creators to promote the Program that explicitly stated or clearly implied that Flex was a rent-to-own program. Defendants paid for these false advertisements on

---

[46] NZXT Flex Rental Agreement, Internet Archive: Wayback Machine (Dec.5, 2024), https://web.archive.org/web/20241205072545/https://fragile.co/legal/subscription-agreement (last visited May 29, 2025).

[47] *Id.*

[48] The California Legislature has addressed this issue of unclear terms in rent to own agreements by passing the Karnette Rental Purchase Act. In that act's statement of legislative intent, they write "The Legislature hereby finds and declares that consumers enter into rental-purchase contracts that do not adequately disclose the actual terms and cost of the transaction or the consumer's liability for certain breaches of the contract, and that contain unfair provisions, including unfair terms related to fees and charges, the exercise or the termination of purchase option rights, property loss and damage, and the repair or replacement of improperly functioning rental property. It is, therefore, the intent of the Legislature in enacting this title to ensure that consumers are protected from misrepresentations and unfair dealings by ensuring that consumers are adequately informed of all relevant terms, including the cash price, periodic payments, total purchase price, and other applicable charges or fees, before they enter into rental-purchase contracts." Cal. Civ. Code § 1812.621 (West).

Class Action Complaint – Case No.

social media channels including Instagram, Facebook, and TikTok between July 2024 and December 2024, at which point, NZXT CEO Johny Hou admitted Defendants' advertising and marketing "were not factual, didn't represent the actual program. Calling it ownership when it really is a rental program."[49] Defendants fraudulently induced Plaintiffs and the Class to enter the Program by falsely advertising that the Plaintiffs would own the PC. While Defendants have since ceased such advertisements, Plaintiffs Burns, Moulton, and Zou were specifically influenced by Defendants' false rent-to-own advertisements and would not have joined the program had they not believed they would own the PC.

89.    A "rent-to-own program" is an arrangement where a buyer leases a product with the option to purchase it later, typically applying a portion of the lease payments toward the eventual purchase price. This structure provides consumers a pathway to ownership, particularly when immediate financing or credit approval is challenging, while also functioning as a trial period to assess the product's suitability.[50]

90.    The FTC has recognized that the rent-to-own industry is a multi-billion-dollar sector offering furniture, appliances, electronics, and jewelry under self-renewing leases, without requiring consumers to continue payments beyond any given week or month.[51] These arrangements often appeal to those lacking the means or credit to make an immediate purchase, particularly because they typically require no down payment and allow consumers to secure

---

[49] NZXT, *Addressing Your NZXT Flex Subscription Concerns*, YouTube (Dec. 4, 2024),. https://www.youtube.com/watch?v=FSp5B--HKL4 at 2:16-2:40

[50] Geoff Williams & Jennifer Ortiz, *Should You Use Rent-to-Own Stores*, US NEWS & WORLD REP. (Apr. 7, 2023),https://money.usnews.com/money/personal-finance/spending/articles/what-to-know-about-rent-to-own-stores.

[51] Federal Trade Commission, *Bureau of Economics Staff Report*: Survey of Rent–to–Own Customers 1–2 (April 2000).

needed items right away. Consistent with this model, Defendants' rent-to-own clause provides that, the "estimated value" of the device and any remaining balances will be considered in the sale price, and that the Lessee may obtain ownership outright at this discounted rate.

91.    Over even a short period, leasing Defendants' PCs under the Program costs considerably more than purchasing the same or similar machine outright, whether via direct cash purchase or even high-interest financing.

92.    Over 24 monthly pay periods,[52] Defendants' monthly fees exceed the lawful maximum. Under the Karnette Rental Purchase Act rental-purchase agreement may not exceed 1.65 times the Lessor's Cost of a Computer System.[53]

93.    To illustrate, the Player: Three Prime retails for $3,339 if purchased outright.[54] Under the Program's pricing model, a lessee pays $259 each month for the Player: Three Prime.[55] Over 24 monthly pay periods, consumers would pay $6,216 or 1.86 times the consumer's cost of Defendants' purportedly equivalent PC. Unless Defendants are selling their most expensive Player: Three Prime at a substantial loss, then Defendants rent-to-own rates exceed the lawful maximum. Moreover, since Defendants provided consumers with substandard Player: Three Prime PCs in their Flex program, it is likely that the original cost to the lessor of the rented PC was substantially lower, meaning that the illegal multiplier was even greater.

---

[52] This time frame is clearly contemplated by Defendants, as they offer an upgrade for trade-ins on rental PCs after two years of rental. *Addressing Your Concerns About the Flex Subscription Program*, NZXT, https://nzxt.com/news/nzxt-update-addressing-your-concerns-about-the-flex-subscription-program (last updated December 3, 2024).

[53] Cal. Civ. Code § 1812.644.

[54] *NZXT Player: Three Prime - AMD Ryzen 7 - RTX 4080 SUPER*, NZXT, https://nzxt.com/product/player-three-prime (last updated January 8, 2025).

[55] *NZXT Flex*, NZXT, https://nzxt.com/collection/flex (last updated January 8, 2025).

Class Action Complaint – Case No.

94.    If the Lessor's cost for the Player: Three Prime is $3,339 and the consumer was entitled to own the PC after 24 monthly payments, then the maximum monthly payment that Defendants could charge consumers is $229.55 for a total PC cost of $5,509.35.

95.    Thus, both Defendants' advertised rent-to-own program and the permissive buy-out option detailed in Defendants' Agreement violate California Law.

96.    By merely stating that they are offering as a subscription rather than a lease, rental, or a financing plan, Defendants attempt to sidestep lending laws and avoid the usury regulations that exist to protect consumers from exactly this type of exploitation.

97.    Defendants have responded to criticisms levelled at them in the wake of Gamers Nexus' investigation by claiming no rent-to-buy scheme has ever existed, despite the existence of advertisements to the contrary and the terms in the Agreement.[56]

### 7.    Defendants' Debt Collection Practices

98.    NZXT relies on Fragile to process payments, ship PCs, determine creditworthiness, manage customer service, and facilitate monthly billing and debt collection for the Program. Fragile represents that it is collecting this debt with NZXT, for NZXT's accounts. Fragile does that by stating that "[t]his is a notice that your NZXT account will soon incur penalties" and "in partnership with NZXT." See Figures 15-16. Lessees incur a debt when leasing through the Program, and Defendants threatened Plaintiffs and Class Members with "penalties," "collections, police reports, small claims court, and potentially wage garnishment at [Defendants'] discretion." Fragile would harass Lessees incessantly emailing and calling even after Lessees did in fact pay that debt.

---

[56] *Addressing Your Concerns About the Flex Subscription Program*, NZXT, https://nzxt.com/news/nzxt-update-addressing-your-concerns-about-the-flex-subscription-program (last updated December 3, 2024)

Class Action Complaint – Case No.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Notice: Your account will soon be escalated and incur penalties**

Hi ██████████

This is a notice that your NZXT account will soon incur penalties. We've emailed, texted, and called you regarding the overdue balance on your account.

Since we have been unable to establish contact with you or reach a resolution, our ability to assume goodwill is quickly diminishing. Please contact us or take action on your account immediately before any further actions are taken.

I'm Joey, the Payment Support & Fraud Prevention Manager at Fragile in partnership with nzxt, and I'm reaching out to you regarding your **Past Due Subscription Balance.**

Our records show that your subscription is currently **106 days past due, and that you do not having a pending commitment to pay in the near future, and have not returned your nzxt device.**

If this was an honest mistake, we've provided a link below where you can quickly and securely **settle your balance** after logging in with your phone number:

https://customers.fragile.co/portal/login

If you'd **rather cancel your subscription**, just reply to this email, and we'll be happy to assist you. Returns must be completed in a timely manner to avoid escalation in these cases.

Additionally, **if you just need some time to pay the balance**, you can email us back with a reasonable commitment date to pay the balance, and we will set that for you in our system. This will stop billing attempts and follow up until that date.

Please be aware that accounts **more than 60 days past due** may be subject to **collections, police reports, small claims court, and potentially wage garnishment** at our discretion. Similar to renting a car, non-return is considered theft and treated as such without reasonable communication or payment. We encourage you to reply and work with us to

*Figures 15-16: Defendants' Dunning Letters threatening Lessees who failed to pay, or even Lessees who did pay but Defendants collection system failed to properly register the payments.*

Class Action Complaint – Case No.

99.    The Agreement contains provisions that affect a Lessee's ability to dispute incorrect or inflated charges. The Lessee must notify Defendants in writing of any improper charge within sixty (60) days, or that charge becomes final and undisputable by contractual definition. This truncated dispute window may accelerate or exacerbate the debt collection process, effectively forcing consumers to pay charges they did not validly incur or risk referral to collection agencies.

100.    The Agreement provides a grace period of either 15 or 60 days to pay off the Lease, as it says, in part: "Section 5... If Subscriber accrues an unpaid balance for more than sixty (60) calendar days, Operator may use all legal methods and remedies available to collect such unpaid balance." Section 8 provides: "If Subscriber accrues any unpaid balance for more than fifteen (15) calendar days, or is in material breach of this Agreement, Operator may immediately suspend Services and take all actions necessary to effect such suspension, including, but not limited to: (i) using technological methods to reduce functionality or disable Rental Devices; and (ii) cease delivery of any current or future Added Services or Added Consumables. Subscriber shall not be entitled to any prorated refund, or delivery of regularly scheduled Services that Subscriber did not receive as a result of suspension. Operator may charge Subscriber any reasonable costs associated with effectuating, and reinstating, a service suspension, including labor time incurred by Operator."

101.    As a result of the forgoing, Plaintiff Zou and Class members have experienced anxiety, stress, anger, frustration, and mental anguish which is fairly traceable to Defendant's harassing debt collection practices which, inter alia, violated substantive rights to be free from unfair and abusive debt collection practices and communications.

**8.    Defendants Admit Wrongdoing**

Class Action Complaint – Case No.

102.    On December 3, 2024, NZXT published a press release responding to the practices described in the Gamers Nexus investigation.[57]

103.    The press release included:

a.  Admission that Defendants' "influencer marketing . . . did not accurately reflect the details of . . . [the P]rogram";
b.  Admission that "[u]nclear product names have caused confusion among [Lessees] . . . searching for the right solution for their needs";
c.  Extension of the dispute window from 60 days to 2 years;
d.  Admission that the hardware spec changes occurred on product webpages regularly, "sometimes in real-time;"
e.  Admission that benchmarks posted on Player PC product pages were incorrect;
f.  Admission Defendants had skipped ID verification.[58]

104.    On December 4, 2024, Fragile updated their Agreement, replacing the March 7, 2023 Agreement.

105.    On December 4, 2024, the CEO of NZXT, Johnny Hou, published a video admitting fault and taking accountability for most of the allegations that Gamers Nexus found.[59]

106.    Mr. Hou admitted that Defendants "messed up."[60]

107.    Mr. Hou agreed that the Player PC names for leased and purchased computers could confuse potential customers as to what hardware was in the Player PC.[61]

108.    Mr. Hou also admitted that "there were ad campaigns . . . that were not factual, didn't represent the actual program, calling it ownership when it really is a rental program.

---

[57] *Addressing Your Concerns About the Flex Subscription Program*, NZXT, https://nzxt.com/news/nzxt-update-addressing-your-concerns-about-the-flex-subscription-program (last updated December 3, 2024).
[58] *Id.*
[59] NZXT, *Addressing Your NZXT Flex Subscription Concerns*, YouTube (Dec. 4, 2024),. https://www.youtube.com/watch?v=FSp5B--HKL4
[60] *Id.* at 1:40
[61] *Id.* at 1:45

Class Action Complaint – Case No.

Ultimately, it's on, it's on (sic) us, right, because we went out and ran these campaigns and its why we pulled them all down."[62]

109.    In short, NZXT pulled its influencer-led Flex advertising because it "did not accurately reflect the details of [its] NZXT Flex program."[63] In NZXT's own words, its advertising "communicate[d] things that are not true."[64]

110.    In no uncertain terms, NZXT's marketing was false, and after its practices were brought to light, NZXT changed the names of "Player PCs" being leased to "Flex PCs" to update "messaging and website content."[65]

111.    Plaintiff Moulton thought he had no commitment to return the PC when he enrolled in the Program. All Plaintiffs believed that their monthly payments allowed them to own their respective PCs. As NZXT ultimately admitted (after being exposed by Gamers Nexus), Plaintiffs and Class members watched paid influencer ads that led them to believe the PC Flex Program was a rent-to-own program and/or Defendants stated Plaintiffs could own the PC.

### 9.    Defendants Worked Together To Further Their Fraudulent Bait-and Switch Scheme

112.    According to Gamers Nexus, in January of 2024 NZXT was "sitting on millions and millions of dollars of stagnant inventory."[66] CEO Johnny Hou informed staff—via an internal

---

[62] *Id.* at 2:18

[63] *Addressing Your Concerns About the Flex Subscription Program*, NZXT, https://nzxt.com/news/nzxt-update-addressing-your-concerns-about-the-flex-subscription-program (last updated January 8, 2025).

[64] *Id.*

[65] *Id.*

[66] NZXT, *Addressing Your NZXT Flex Subscription Concerns*, YouTube (Dec. 4, 2024),. https://www.youtube.com/watch?v=FSp5B--HKL4 at 9:08 – 10:10

Class Action Complaint – Case No.

message—that the entire U.S. PC-building team would be laid off and production outsourced, vacating the California warehouse by the end of March 2024.[67]

113.    With shelves full of parts that were quickly aging, NZXT formed the Enterprise with Fragile to create and administer the Flex rental Program. The common purpose of Defendants' Enterprise was to profit from excess CPUs, GPUs, and coolers by re-packaging and leasing rental computers through grossly misleading representations and material omissions about the nature of the Program.

114.    NZXT and Fragile are two separate and distinct business entities who colluded to create this pattern of coordinated racketeering activity to enhance their profitability.

115.    NZXT furthered the purpose of this Enterprise by falsely advertising and misleading the consuming public about the nature of Defendants' PCs and the Program. Fragile furthered the purpose of this Enterprise by introducing contradictory and misleading contracts of adhesion, that, in the context of Defendants' overall promises, were illegal rent-to-own contracts, and furthering these lies within their direct communications with Plaintiffs and the Class.

116.    Flowing naturally from NZXT's fraudulent sales conversions and Fragile's illegal contracts and program operation, both Defendants benefited through greater revenues from the Program.

117.    The Enterprise formed of NZXT and Fragile involved ongoing organization between Defendants with each party having specific and co-dependent roles in the ongoing activities. This ongoing Enterprise existed at least from July 2024 to the present.

---

[67] *Id.*

Class Action Complaint – Case No.

118.    Defendants' Enterprise makes it difficult for consumers to distinguish with which Defendant they are dealing.

119.    When a Lessee leases a Player PC under the Program, the Lessee must first visit NZXT.com and navigate to the "NZXT Flex" page.

120.    Then the Lessee clicks on a PC they wish to lease, which redirects the Lessee to the web page in *Figure 17* below.



*Figure 17: The Website's interface when a Lessee navigates to try and Subscribe to the Program.*

121.    After clicking on the "Subscribe" button, the Lessee is directed to a website with the domain name https://flex.nzxt.com/. While NZXT's logo is prominently displayed at the top

Class Action Complaint – Case No.

of the page, Lessees must scroll to the bottom of the webpage to discern any involvement from

Fragile, where they are named in grey font against a grey background, as depicted in *Figures 18-20 below*.



*Figure 18: The checkout page a Lessee sees when they navigate past the Subscribe button, with the "NZXT" logo predominantly displayed on the top banner of the page. Red box added by counsel to highlight "NZXT" logo.*



*Figure 19: The checkout page a Lessee sees when they scroll down on the page, with the phrase "Powered by Fragile" in small grey font, blending into the grey background of the webpage. Red box added by counsel to highlight.*

Class Action Complaint – Case No.

*Figure 20: The checkout page a Lessee sees when they scroll down on the webpage, with the phrase "Powered by Fragile" in small grey font, zoomed in to the Fragile logo.*

122.    As shown in Figure 19 above, below the "Submit Order" button, the website's account creation interface deploys what is commonly referred to as a "sign-up wrap" agreement, in which the user purportedly assents to terms simply by proceeding with the sign-up or checkout process. Unlike a "clickwrap" agreement, a sign-up wrap typically relies on language placed near a button or hyperlink, without the user having to affirmatively check a box or otherwise mark their acceptance of the terms. Here, no separate checkbox or conspicuous acceptance mechanism is presented to Lessees before proceeding with the Agreement. Instead, the user is funneled through a path wherein they click on "Submit Order," with no clear notice of the Agreement that includes aforementioned onerous terms and contradictory terms with regard to the rent-to-own nature of the program.

123.    Defendants' interface does not conspicuously display these terms or give the Lessee fair notice of any legally binding agreement. As shown by the small font and subdued colors, references to Fragile's terms are effectively obscured. This lack of clear disclosure—paired with the absence of an affirmative acceptance checkbox—fails to provide users with sufficient notice. Consequently, the Agreement lacks the hallmarks of assent necessary to bind the Lessee, rendering the terms unenforceable.

124.    Defendants send bills under the name "Frgl Nzxt," as depicted in Figure 21.

Class Action Complaint – Case No.



*Figure 21: Defendants provide receipts and debt collection documentation under
the name "Frgl Nzxt." Last four digits redacted for privacy.*

125.    NZXT and Fragile closely coordinate their operations in connection with the

Program. Their collaboration is evidenced by invoices and payment receipts issued under the

combined or otherwise obscured name "Frgl Nzxt," which Lessees perceive as a single entity,

shown in in Figure 21 above.

126.    Defendants obfuscate which company handled billing, support, and product

fulfillment, as Lessees routinely receive notices or charges referencing both NZXT and Fragile.

127.    On December 5, 2024, Mr. Hou participated in an interview with JayzTwoCents

to provide clarity about the Program.[68]

128.    When asked to explain the duties and responsibilities shared between NZXT and

Fragile, Mr. Hou emphasized that Fragile is a "totally different company [from NZXT] but let me

---

[68] *See* JayzTwoCents, *Confronting NZXT's CEO about the Flex Program*, YouTube (Dec. 5,
2024), https://www.youtube.com/watch?v=8qqeMWrrxMc (Last Visited Apr. 23, 2025).

let me just break it down a little because I don't think it's obvious… we're all linked up.... when you go to check out, you actually see the Fragile logo."[69]

129.    Mr. Hou understood that Lessees could be confused as to who they were dealing with while leasing under the Program "because we're the brand in front of [the Website]; it's easy right for people to assume like it's all on us but well yeah."[70]

130.    However, even Mr. Hou conflated NZXT and Fragile in public interviews as he affirmed that "NZXT/Fragile [were] the operator in this [Program]."[71]

131.    Mr. Hou clarified that NZXT is "the brand in front of FLEX, the program."[72]

132.    NZXT provides the products leased under the Program, and NZXT is responsible for "generating the marketing behind it . . . ."[73]

133.    As to Fragile, Mr. Hou noted that "when you subscribe to Flex," Fragile "goes through . . . like an underwriting process to make sure there's no risk and everything[,]" after which Fragile purchases the PCs from NZXT, and has the PCs sent from a third-party production facility to the Lessee.[74]

134.    Once a Lessee leases a Player PC, "the relationship [with Lessees] is . . . moved over [from NZXT] to Fragile, because Fragile has now purchased [the Player PCs] from [NZXT] and that relationship is between that customer and Fragile."[75]

---

[69] Id. at 02:20.
[70] Id. at 03:30.
[71] Id. at 17:15.
[72] Id. at 2:25.
[73] Id. at 2:25
[74] Id. at 2:40
[75] Id. at 3:01

Class Action Complaint – Case No.

135.    Even so, Mr. Hou sees the Program as "an end-to-end experience" such that "if an issue comes up on [Fragile's] end, [NZXT] know[s] about it—we're all linked up."[76]

136.    In short, NZXT is responsible for the Program up until prospective customers actually become Lessees, after which Fragile takes over handling the Program.

137.    Defendants are independent parties inextricably bound in running the Program.

138.    Defendants have intentionally obscured their Enterprise. If a Lessee tried to navigate to Fragile's website at Fragile.co, they are met with a webpage with no buttons or user interface other than the Fragile logo. There is no information anywhere on the website about the company is or what it does. See *Figure 22,* below:



*Figure 22: Fragile.co, a website with no information on it other than the Fragile logo.*

139.    Thus, even an enterprising potential Lessee would be hard-pressed to determine Fragile's role in the Program.

140.    NZXT and Fragile both profit from the shared arrangement, as shown by the flow of recurring monthly payments and fees.

---

[76] *Id.* at 3:11

Class Action Complaint – Case No.

141.    Fragile initiates the billing, and each party benefits from keeping Lessees locked into monthly payments under terms that are difficult to cancel or fully comprehend. This arrangement incentivizes the companies to continue issuing joint branding and billing under "Frgl Nzxt," thereby obscuring who is ultimately responsible for addressing consumer complaints or providing refunds.

142.    Fragile is primarily responsible for enforcing the prices advertised on NZXT's website, including any subsequent monthly charges or changes in price. By controlling these pricing mechanisms, Fragile played a direct role in determining the ongoing subscription fees that consumers were charged.

143.    Fragile's pricing enforcement caused confusion among Lessees regarding which entity (NZXT or Fragile) was ultimately accountable for billing, pricing disputes, or refund requests.

144.    Lessees unhappy with their service from Defendants were also frustrated in their attempts to exit the Program.

145.    To illustrate, some Lessees who attempted to exit the Program were prevented from exiting by Defendants as they provided links to broken or missing webpages meant for lease cancellation, disabling Lessees from cancelling their rental and exiting the Program.[77]

**10.    The Enterprise's Use of Mails and Wires**

146.    Defendants used the interstate wires and mails to effectuate their fraudulent Enterprise. Defendants' scheme involved grossly misleading promises regarding the

---

[77] *See* Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 1:18

Class Action Complaint – Case No.

specifications and attributes of Program PCs, the nature of Defendants' nationwide Program, and Defendants' implementation of these fraudulent contracts.

147.    Defendants used interstate wire communications to organize, create, develop, advertise, and administer their fraudulent scheme. Defendants use of the wires included fraudulent misrepresentations to Plaintiffs and the Class. NZXT used the mails and wires to orchestrate a nationwide advertising campaign to induce consumers into joining the Program. Specifically, as mentioned above, NZXT stated that the Program involved no contracts, no return fees, that the user owned the PC, that consumers would receive new PCs that contained specific components while consumers received used PCs with far inferior components, and that consumers would receive PCs that were capable of unrealistic and impossible performance metrics based on the components advertised. NZXT made many of these grossly misleading and false statements. Fragile administered the Program and perpetuated NZXT's falsehoods through the wires as Fragile customer service representatives specifically stated that consumers could buy out the PC from Fragile at a discounted rate after a period of payments.

148.    Defendants use of the mails included, but is not limited to, the distribution of falsely advertised and under spec PCs and the general transportation of Program PCs including for repairs and replacement components. Defendants, specifically Fragile, used the mails to distribute under spec PCS with full knowledge that the Player PCs and Program had been falsely advertised.

149.    Defendants' gross misrepresentations were intentional and were expressly meant to induce consumers, such as Plaintiffs and the Class into believing that consumers would receive higher quality PCs than consumers actually received, that PCs were new, that there were no cancellation fees, no contracts, and that consumers would have the right to own the PC.

44

150.    With these fraudulent representations in place, Defendants used both the mails and wires to implement their scheme through, *inter alia*, transporting or shipping Program PCs and components.

151.    The mails and wires were further used to facilitate communications between NZXT and Fragile. NZXT advertised the Program and manufactured the PCs while Fragile administered the Program including shipping, billing, and account management. Defendants recorded and transmitted account and billing information through use of the wires. Defendants both used the mails and wires to coordinate and implement this Enterprise.

152.    Plaintiffs sent NZXT a demand letter via email and USPS Certified Mail on January 8, 2025. Plaintiffs sent the demand letter to NZXT, INC, ATTN Legal 13164 E Temple Ave. City of Industry, CA, 91746, found in the NZXT Terms of Service.[78] On February 24, 2025, USPS returned the letter to sender citing an insufficient address, unable to forward. Plaintiffs found a secondary address to NZXT and mailed the demand letter via USPS certified Mail on February 26, 2025.

153.    On April 3, 2025, Counsel for NZXT and Fragile responded to Plaintiffs demand letter and denied all allegations.

## V.    CLASS ACTION ALLEGATIONS

154.    Pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3), Plaintiffs bring this action on behalf of a proposed Class (the "Nationwide Class") and "State Subclasses" defined as follows:

> **Nationwide Class**: All persons in the United States who have leased a PC from Defendants or otherwise participated in the Program (the "Class").

---

[78] *NA - TOS*, NZXT, https://nzxt.com/legal/terms-of-service?srsltid=AfmBOopuz8d0E3NnN9NKU_IhwZTZf_J6Aqds55vR3WMPieX1N4iIKJTs (last updated May 24, 2018).

Class Action Complaint – Case No.

**Debt Collection Class:** All persons in the United States who leased a PC from Defendants or otherwise participated in the Program and whose payments were at some point delinquent.

**California Subclass**: All members of the Nationwide Class who reside in California.

**California Debt Collection Subclass**: All members of the Debt Collection Class who reside in California

**New York Subclass**: All members of the Nationwide Class who reside in New York.

**Washington Subclass**: All members of the Nationwide Class who reside in Washington.

155.    Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any of Defendants' officers or directors, any successors, all persons who make a timely election to be excluded from the Class, and any judge who adjudicates this case, including their staff and immediate family.

156.    Plaintiffs reserve the right to amend the class definition and/or subclass definition. Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

157.    **Numerosity and Ascertainability:** Members of the Class are so numerous that joinder is impracticable. There are, at a minimum, millions of members of the proposed Class and, at minimum, thousands of members of each State Subclass.

158.    **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class members. These common questions include:

a.    Whether Defendants took payment from Lessees through debit card, credit card, or some other payment method;
b.    Whether Defendants' practices were unfair or deceptive and likely to mislead a reasonable consumer looking to lease a Player PC from Defendants;

Class Action Complaint – Case No.

c.  Whether Defendants' misrepresentations or material omissions would likely impact a reasonable consumer's decision to participate in the Program;

d.  Whether Defendants' agreements with Plaintiffs and the Class is a rental-purchase agreement;

e.  Whether Defendants required that Plaintiffs and the Class pay an effective interest rate greater than is permitted under the California Constitution or the Karnette Rental-Purchase Act;

f.  Whether Defendants used the mails and wires to facilitate fraudulent sales to Plaintiffs and Class members; and

g.  Whether Defendants violated Racketeer Influenced and Corrupt Organizations Act

159.  These common questions of law and fact predominate over questions that affect only individual Class members.

160.  **Typicality:** Plaintiffs' claims are typical of the other Class members' claims because all Class members were comparably injured through Defendants' substantially uniform misconduct, as described above. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other members of the Class that they represent, and there are no defenses that are unique to the Plaintiffs. The claims of Plaintiffs and Class members arise from the same operative facts and are based on the same legal theories

161.  **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation.

162.  **Superiority**: Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them. Defendants have acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

Class Action Complaint – Case No.

163.    Plaintiffs make the following specific fraud allegations with as much specificity as possible, although Plaintiffs do not yet have the benefit of discovery to access information necessarily available only to Defendant at this stage of the litigation.

164.    **Who:** Both NZXT and Fragile knew of and actively concealed that their advertisements and descriptions of the Program on their website were false, that Defendants delivered PCs that did not adhere to promised specifications and attributes, and that Defendants misled consumers regarding the nature of the program. NZXT CEO Hou explicitly admitted that Defendants' advertisements were not factual and misrepresent the program.

165.    **What:** Defendants knew that their advertisements promised consumers PCs with certain attributes and qualities but delivered objectively and materially substandard products. Defendants knew that they advertised no cancellation fees, but in fact instituted cancellation fees. Defendants knew that their advertisements promised brand new PCs and components but instead delivered used PCs and components. Defendants knew that their advertisements promised that consumers would own their PC, then included unclear, inconclusive, and lopsided terms regarding the rent-to-own nature of the Program in an obscured sign-in wrap agreement. Defendants knew that they were misrepresenting the rights and obligations created by Defendants' Program.

166.    **When**: Defendants concealed their fraudulent PC rental scheme at all times, and specifically between July 2024 and the present.

167.    **Where:** Defendants concealed their PC rental scheme through misrepresentations and omissions on their websites, in their paid advertisements including on social media channels, and in direct communications with consumers.

168.    **How**: Defendants accomplished their PC rental scheme through a bait-and-switch where Defendants (1) advertised PCs with specific components and attributes but provided

Class Action Complaint – Case No.

consumers with lower quality components PCs and (2) misrepresented the nature of the Program including that there were no contracts, no cancellation fees, that consumers would own the PC, and leading customers to reasonably believe the Program was a rent-to-own agreement. Defendants misleading sales and advertising practices, along with bifurcating sales and marketing against the operation of the rental Program and debt enforcement, allowed Defendants to offload their supply of aging and stagnant inventory at an unlawful premium.

## VI. CAUSES OF ACTION
### COUNT ONE

RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
("RICO") 18 U.S.C. §§ 1961, *ET SEQ*.
Violations of 18 U.S.C. § 1962(c).

(On Behalf of Plaintiffs and the Nationwide Class)

169.    Plaintiffs reallege and incorporate by reference paragraphs 1-168 as if fully set forth herein.

170.    18 U.S.C. § 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

171.    Civil RICO claims are evidenced by: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 361, (9th Cir. 2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996)).

172.    "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person'

49

Class Action Complaint – Case No.

referred to by a different name." *Id.* (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)).

173.    Defendant NZXT and Defendant Fragile are each a separate legal entity, both of which constitute "person[s]" within the meaning of 18 U.S.C. § 1961(3) as each Defendant is "capable of holding a legal or beneficial interest in property." *Id.*

174.    The NZXT and Fragile Enterprise is a legal association, or at least an association-in-fact, within the meaning of 18 U.S.C. § 1961(4), and both Defendants acted to fraudulently implement the Program for their own financial gain. The Enterprise is an ongoing organization and that was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of the Defendants is a "person" distinct from the Enterprise.

175.    Under 18 U.S.C. § 1962(c) Defendants are "associated" with each other and maintained systematic links for the common purpose of fraudulently implementing the Program, whereby Defendant NZXT provided the PCs, marketing, and the customer pool for the Program, and Defendant Fragile handled the underwriting and management of the Program. Defendants established the Enterprise to accomplish goals that were instrumental to their scheme.

176.    The Enterprise and both Defendants engaged in and affect interstate commerce, as they market and ship PCs across the United States.

177.    The Enterprise engaged in and affected interstate commerce. NZXT coordinated the manufacture of PCs and utilized the nationwide internet to falsely advertise and promote the Program's products and services, including engaging social media influencers from multiple states to target minors with advertising for the Program. Fragile employed telephone and email communications to effectuate the fraudulent scheme when it contacted consumers nationwide for purposes of raising fees, debt collection, and falsely suggested that consumers could own the PC.

Class Action Complaint – Case No.

Fragile further shipped these fraudulently advertised PCs across the nation through use of the mails. By pursuing these activities across state lines, both NZXT and Fragile demonstrably leveraged and impacted commerce on a broad, interstate scale.

178.    NZXT and Fragile conducted or participated in the conduct of each other's affairs through a pattern of racketeering activity, as NZXT created and marketed the products underwritten and leased by Fragile, where both entities had control over the terms of the Program, in addition to the pricing and enforcement of the terms of the Program. § 1962(c).

179.    Though separate entities, Defendants are inextricably linked through the offering and management of the Program.

180.    Defendants each received a financial benefit for their participation in the NZXT-Fragile relationship.

181.    Defendants enacted this Enterprise for financial benefit from unsuspecting consumers and for the purpose of offloading old and inferior inventory at premium prices.

182.    Defendants' economic benefits were the product of the Program, as outlined above, and could not have been realized had the relationship not existed.

183.    NZXT and Fragile engaged in fraudulent conduct that is difficult, if not impossible, for consumers to distinguish as to which entity is responsible for said conduct.

184.    Defendants engaged in a pattern of racketeering activity, "predicate acts," including mail and wire fraud. As detailed herein, Defendants' pattern of racketeering activity includes acts indictable as wire and/or mail fraud under 18 U.S.C. §§ 1341, 1343. Defendants fraudulent scheme consisted of (1) deliberately misrepresenting the specifications and attributes of Program PCs as well as the nature of the Program through use of the wires, (2) concealing these misrepresentations and material omissions before shipping fraudulently advertised PCs through

Class Action Complaint – Case No.

use of the mails, (3) charging plaintiffs and Class members for products that they never received or for product with specifications that they did not receive, and (4) misrepresenting the Enterprise.

185.    Together NZXT and Fragile committed the predicate act of mail fraud as they knowingly mailed, or caused to be mailed, PCs in furtherance of a bait-and-switch scheme by advertising computer hardware specifications of a specific quality, only to furnish or cause to be furnished materially different or less valuable used products. Moreover, each Defendant has conducted and/or participated in the conduct of each other's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), by engaging in acts of mail fraud in connection with the marketing, sale, distribution, and debt collection of these misrepresented PC products. For example, the Defendants created misleading advertising materials purporting to offer consumers ownership over new PCs with given specifications and shipped, via the mail, PCs to consumers with used and inferior components and consumers had no ownership over these PCs.

186.    NZXT and Fragile committed the predicate act of wire fraud as they knowingly used interstate wire communications for fraudulent advertisements and to harass consumers while collecting purported debts for misrepresented PC products. Specifically, Fragile placed repeated telephone calls and sent emails and text messages—often after consumers already requested that such calls cease or had fully satisfied their payment obligations—demonstrating not only its awareness that these contacts were unwelcome, but also its intent to harass consumers. Despite being advised to stop calling, Fragile persistently violated such requests, thereby using telephonic and other electronic communication methods as a tool of committing or attempting to commit fraud. Through this pattern of unwarranted and intrusive calls, Fragile furthered the bait-and-switch scheme, using these wire communications to collect payment for products that were not as advertised. Defendants' Agreement further attempted to eliminate virtually any means by which

Class Action Complaint – Case No.

a consumer could vindicate their rights against Defendants when Defendants inevitably provided subpar PCs. Lessees could not return the PC for a refund except in exceptional circumstances, Lessees had an unreasonably short period to dispute charges.

187. Through engaging in the above, Defendants have each conducted and/or participated in each other's affairs through repeated acts of wire fraud, in violation of 18 U.S.C. § 1962(c).

188. Defendants or their agents, for the purpose of executing this illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the fraudulently advertised PCs and related documents, as described above and alleged below:

| **From** | **To** | **Date** | **Description** |
|---|---|---|---|
| Fragile Inc. | Plaintiff Jacob Burns | November 2024 | Burns' faulty and subpar Player: Three Prime PC that included a faulty RTX4090 and could not remain active for more than an hour. Associated documentation and communications. |
| Fragile Inc. | Plaintiff Jacob Burns | December 2024 | Burns' faulty and subpar replacement Player 3 Prime PC with an RTX4080 Super rather than the promised RTX4090. Associated documentation and communications. |
| Fragile Inc. | Plaintiff Jacob Burns | March 2024 | Burns' replacement for the initially faulty NZXT Kraken Elite CPU Cooler. Burns' was promised a new Kraken Elite CPU Cooler, but was provided with a defective and used component that destroyed the computer. |

189. Defendants or their agents, for the purpose of executing this illegal scheme, sent and/or received (or caused to be transmitted) by means of wire communications, certain writings, signs, signals, and sounds as described above and alleged below:

Class Action Complaint – Case No.

| From | To | Date | Description |
|------|-----|------|-------------|
| Fragile Inc. | Plaintiff Jacob Burns | December 2024 | Fragile representative stated that upon receipt of Plaintiff Burns' originally defective Flex PC, he would be shipped a replacement PC per his original contract, which included an RTX4090. Plaintiff Burns later received the substantially inferior RTX4080 Super. |
| Fragile Inc, | Plaintiff Steven Zou | February 2024 | Plaintiff Zou called an Agent and during an interview to sign up for the Program was told that he could own his Player: Three Flex after a period of months of renting it, and after he paid a lump sum payment. Plaintiff Zou would merely need to call to utilize this feature. |
| Fragile Inc. | Plaintiff Steven Zou | February 2024 | Fragile representative later sent text communication to Plaintiff Zou stating that he could not own the PC after a period of payments. |
| NZXT Paid Promoters | Plaintiff Jonathan Moulton | November 2024 | The Flex Program was advertised to Plaintiff Moulton —through NZXT's influencer advertisements—as a rent-to-own plan: pay a fixed monthly charge, build equity in the machine, and assume ownership. Plaintiff Moulton only learned that the Program was not a rent to own Program when he watched the Gamer's Nexus Investigation.[79] |

190.     Defendants or their agents, for the purpose of executing this illegal scheme, sent and/or received (or caused to be transmitted) to the public at large by means of wire communications, certain writings, signs, signals, and sounds as described above and alleged below:

---

[79] *See* Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0

Class Action Complaint – Case No.

| **Source** | **Description** |
| --- | --- |
| Defendants' Paid Partner Samsonjc22 | Defendants' agent falsely stated that "You can now own and game on a [Flex Program] PC." |
| Defendants' Paid Partner JayHym | Defendants' agent stated that users would receive a $3,000.00 Player Two gaming PC for only $120.00 per month when what was described was not a Player Two PC and was for sale on NZXT's website for $1,449.00. |
| Defendants' Paid Partner BlipTech | Defendants' agent falsely stated that the Program provided consumers with "Brand New PCs." |
| Defendants' Paid Partner BlipTech | Defendants' agent stated that returning the PC was free and there were not any cancellation fees, which directly contradicts Defendants' Agreement. |
| Defendants' Paid Partner Marileighjo | Defendants' agent falsely stated that the Program had "no strings attached" that there were no cancellation or replacement fees, and that the Program includes a lifetime warranty. |
| Defendants' Paid Partner Givemchills | Defendants' agent falsely stated that the Program required "no contracts." |
| Defendants' Paid Partner Gutzyaiden | Defendants' agent falsely stated that the Program has no strings attached, requires "no commitment" and that there are no cancellation or "replacement fees if anything goes wrong." |
| NZXT Website | Defendants' falsely stated that the Program entailed no commitment, had no strings attached, and had no cancellation fees. |
| NZXT Website | Defendants' falsely stated that two Program PCs had the exact same performance when one computer included a demonstrably and substantially inferior graphics card, an NVIDEO GeForce RTX 4070 Ti contrasted with an NVIDEO GeForce RTX 4070 Ti Super. |
| NZXT Website | Defendants' falsely stated on the very same product page that the same Player Two PC provided both 140 and 215 FPS when playing a given video game, more than a 50% increase in performance. |
| NZXT Website | Defendants' falsely stated on the very same product page that a Player PC with the exact components and specifications had different FPS metrics for multiple provided video games. |

191.    Defendants themselves admitted that their advertisements were not factual and did not accurately represent the Program, including where the advertisements made consumers believe that they would own their PC.

Class Action Complaint – Case No.

192.    NZXT and Fragile's deceptive practices and aggressive collection efforts have directly caused injury to Plaintiffs' business or property interests. By advertising premium PCs but delivering materially inferior products, NZXT required Plaintiffs to pay prices that exceeded the fair market value of the hardware they actually received, thereby depleting Plaintiffs' financial resources. Fragile's relentless and often unwarranted collection attempts—such as repeated, harassing phone calls even after debts had been satisfied—further compounded the harm, as Plaintiffs and Class Members were forced to expend additional time and resources to dispute unwarranted charges and attempt to stop collection activity. Each of these expenditures of funds, time, and effort represents a tangible and quantifiable loss to Plaintiffs' business or property. By coordinating their roles within their business relationship to misrepresent the nature and value of the products sold and to aggressively collect on debts that were often inflated or already paid, Defendants have jointly inflicted real and measurable financial harm upon Plaintiffs.

## COUNT TWO

RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
("RICO") 18 U.S.C. §§ 1961, *ET SEQ*.
Violations of 18 U.S.C. § 1962(d).

(On Behalf of Plaintiffs and the Nationwide Class)

193.    Plaintiffs reallege and incorporate by reference paragraphs 1-168 as if fully set forth herein.

194.    Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

195.    In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described previously through a

Class Action Complaint – Case No.

pattern of racketeering activity. Defendants conspired to fraudulently market, sell, and implement a Program of PC rentals for their own financial gain.

196.    Defendants carried out numerous deliberate fraudulent racketeering acts and omissions in furtherance of the conspiracy. These included material misrepresentations and omissions intended to deceive and defraud Plaintiffs and the Class of their money and property.

197.    Defendants sought to commit and have engaged in the commission of multiple overt acts of unlawful racketeering predicate acts, including but not limited 18 U.S.C. §§ 1341 and 1343.

198.    Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Class, such that Plaintiffs and the Class are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees.

### COUNT THREE

THE FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
15 U.S.C. §§ 1692d *ET SEQ.*, and 12 C.F.R. §§ 1006.14 *ET SEQ.*

(On Behalf of Plaintiff Zou and the Debt Collection Class)

199.    Plaintiff Zou ("Plaintiff" for purposes of this Count), individually and on behalf of the Debt Collection Class, repeats and realleges paragraphs 1-168 as though fully set forth herein.

200.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) of the FDCPA

201.    Defendant Fragile is a "debt collector" as defined by § 1692a(6) of the FDCPA, because it regularly uses email, which is an instrumentality of interstate commerce, and/or the telephone to collect, or to attempt to collect, delinquent consumer accounts, and is similarly a business whose principal purpose is the collection of debt.

Class Action Complaint – Case No.

202. Defendant Fragile identifies itself as a debt collector and is engaged in the business of collecting or attempting to collect, directly or indirectly, defaulted debts owed or due, or asserted to be owed or due, to others.

203. Defendant Fragile collects debt in the name of NZXT, triggering the "false name exception under 15 U.S.C. § 1692a(6)." This false name exception aims to prevent deceit as to who is actually collecting the debt. As a general matter, creditors are not subject to the FDCPA. However, a creditor becomes subject to the FDCPA if the creditor 'in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.' 15 U.S.C. § 1692a(6). A creditor uses a name other than its own when it uses a name that implies that a third party is involved in collecting its debts, 'pretends to be someone else' or 'uses a pseudonym or alias.'" *Villarreal v. Snow*, No. 95–2484, 1996 WL 473386, at *3 (N.D. Ill. Aug.19, 1996)). Fragile uses NZXT's name to collect their debt.

204. The subject consumer debt is a "debt," as defined by FDCPA § 1692a(5), as they arise out of a transaction due, or asserted to be owed or due, to another for personal, family, or household purposes.

205. The FDCPA, pursuant to 15 U.S.C. § 1692d, prohibits a debt collector from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." § 1692d(5) further prohibits debt collectors from "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."

206. The amended Regulation F provides further guidance on what circumstances constitute harassing and oppressive debt collection conduct. Regulation F

"prohibits a debt collector from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection

Class Action Complaint – Case No.

of a debt. The general prohibition covers the specific conduct described in § 1006.14(b) through (h), as well as any conduct by the debt collector that is not specifically prohibited by § 1006.14(b) through (h) but the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Such conduct can occur regardless of the communication media the debt collector uses, including in-person interactions, telephone calls, audio recordings, paper documents, mail, email, text messages, social media, or other electronic media, even if not specifically addressed by § 1006.14(b) through (h)."

207.    12 C.F.R. 1006.14(a)(1). Additionally, pursuant to 12 C.F.R. § 1006.14(h), a debt collector cannot "communicate or attempt to communicate with a person through a medium of communication if the person has requested that the debt collector not use that medium to communicate with the person."

208.    Defendant violated 15 U.S.C. §§ 1692d & 1692d(5), as well as 12 C.F.R. §§ 1006.14(b)(2) & 1006.14(h), through its harassing and noncompliant collection campaign directed towards Plaintiff and the Debt Collection Subclass. Plaintiff Zou notified Defendant Fragile that its calls were not welcome and needed to cease. Defendant Fragile would place those calls even after a Plaintiff paid their debt in full. Defendant Fragile knew that its continued placement of phone calls would be unwelcome to Plaintiff, yet nevertheless persisted, illustrating its intent to harass Plaintiff through its phone calls. Further, upon becoming aware of Plaintiff's desire to receive no further collection calls regarding the subject consumer debt, Defendant was obligated to cease utilizing such medium of communication in its efforts to collect the subject consumer debt from Plaintiff – however, such calls persisted notwithstanding Defendant's obligation to cease. Defendant's conduct in placing repeated calls to Plaintiff in short succession further illustrates the harassing intent behind its calls. Defendant engaged in this harassing and noncompliant conduct in an effort to harass and annoy Plaintiff into addressing the subject consumer debt.

Class Action Complaint – Case No.

## COUNT FOUR

THE FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
Violations of 15 U.S.C. §§ 1692f *ET SEQ.*

(On Behalf of Plaintiff Zou and the Debt Collection Class)

209.    Plaintiff Zou ("Plaintiff" for purposes of this Count), individually and on behalf of the Debt Collection Class, repeats and realleges paragraphs 1-168 as though fully set forth herein.

210.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) of the FDCPA

211.    Defendant Fragile is a "debt collector" as defined by § 1692a(6) of the FDCPA, because it regularly uses email, which is an instrumentality of interstate commerce, and/or the telephone to collect, or to attempt to collect, delinquent consumer accounts, and is similarly a business whose principal purpose is the collection of debt.

212.    Defendant Fragile identifies itself as a debt collector and is engaged in the business of collecting or attempting to collect, directly or indirectly, defaulted debts owed or due, or asserted to be owed or due, to others.

213.    The FDCPA, pursuant to 15 U.S.C. §1692f, prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."

214.    Defendants have attempted to collect debt in violation of 15 U.S.C. § 1692f in that it repeatedly called Plaintiff's phone number after Plaintiff explicitly requested Defendant not communicate by phone and after Plaintiff had paid the overdue balance.

215.    Defendant's willful and knowing violations of the FDCPA entitle Plaintiffs to actual and statutory damages under 15 U.S.C. § 1692k(a)(2)(A).

## COUNT FIVE

CALIFORNIA'S ROSENTHAL FAIR DEBT
COLLECTION PRACTICES ACT (RFDCPA)
CAL. CIV. CODE § 1788 *ET SEQ.*

60

Class Action Complaint – Case No.

(On Behalf of California Plaintiff and the California Debt Collection Subclass)

216.    Plaintiff Steven Zou ("Plaintiff" for purposes of this Count"), individually and on behalf of the California Subclass, realleges and incorporates by reference paragraphs 1-168 as if fully set forth herein.

217.    The California legislature found that "[t]here is need to ensure that debt collectors and debtors exercise their responsibilities to one another with fairness, honesty and due regard for the rights of the other." Cal. Civ. Code § 1788.1(2). The purpose of the RFDCPA with is "to prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts and to require debtors to act fairly in entering into and honoring such debts, as specified in this title." *Id.*

218.    Plaintiff is a "person" as defined by Cal. Civ. Code § 1788.2(g). The term "person" means a natural person, partnership, corporation, limited liability company, trust, estate, cooperative, association or other similar entity. *Id.*

219.    The subject consumer debt is a "debt" and "consumer debt" as defined by Cal. Civ. Code §§ 1788.2(d) and 1788.2(f). The term "debt" means money, property or their equivalent which is due or owing or alleged to be due or owing from a natural person to another person. The terms "consumer debt" and "consumer credit" mean money, property or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction. *Id*. Pursuant to the Agreement, Defendants allowed a grace period to pay for the Lease of either 15 or 60 days, which acts as a credit.

220.    Defendant Fragile is a "debt collector" as defined by Cal. Civ. Code § 1788.2(c). The term "debt collector" means any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection. The term includes any person who composes and sells, or offers to compose and sell, forms, letters, and other collection media

Class Action Complaint – Case No.

used or intended to be used for debt collection, but does not include an attorney or counselor at law. *Id.*

221.    "Notwithstanding any other provision of this title, every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Section 1692b to 1692j, inclusive of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." Cal. Civ. Code § 1788.17

222.    As outlined above, through its unlawful conduct in attempting to collect upon the subject consumer debt, Defendant violated § 1788.17; and §§ 1692d, 1692e and 1692f of the RFDCPA. Defendant employed a series of harassing and unconscionable means while attempting to collect the subject consumer debt, as outlined above.

223.    Despite their best efforts to maintain timely payments, Plaintiffs encountered persistent obstacles in attempting to pay their debts and rental fees to Defendant. On multiple occasions, Plaintiffs followed Defendant's prescribed payment or cancellation procedures—whether through online portals, email communications, or telephone support—but were met with technical errors.[80]

224.    Notwithstanding Plaintiffs' good-faith efforts to resolve any outstanding obligations, Defendant Fragile repeatedly subjected Plaintiff and the Debt Collection Subclass to phone calls, emails, and other communications demanding payment. These collection attempts persisted even in scenarios where Plaintiffs had already satisfied their debts, made repeated

---

[80] Gamers Nexus *Do Not Buy NZXT | Predatory, Evil Rental Computer Scam Investigated*, YouTube (Nov. 30, 2024), https://www.youtube.com/watch?v=0pomC1CfpC0 at 01:18.

Class Action Complaint – Case No.

attempts to cancel their rentals, or explicitly requested Defendant not communicate about debts via phone.

225. Defendant willfully and knowingly violated the RFDCPA. Defendant was aware that Plaintiff did not wish to receive any more collection calls to her cellular phone, yet Defendant continued to bombard Plaintiff with such calls, demanding payment for the subject consumer debt.

226. Defendants' willful and knowing violations of the RFDCPA entitle Plaintiffs to compensatory and statutory damages, injunctive relief, as well as their reasonable attorneys' fees and costs.

## COUNT SIX

VIOLATION OF THE KARNETTE RENTAL PURCHASE ACT
CAL. CIV. CODE §§ 1812.620, *ET SEQ*.

(On Behalf of the California Subclass)

227. Plaintiff Steven Zou ("Plaintiff" for purposes of this Count"), individually and on behalf of the California Subclass, realleges and incorporates by reference paragraphs 1-168 as if fully set forth herein.

228. The California Legislature has declared the following in the Statement of Purpose of the Karnette Rental-Purchase Act Civil Code § 1812.621:

> It is, therefore, the intent of the Legislature in enacting this title to ensure that consumers are protected from misrepresentations and unfair dealings by ensuring that consumers are adequately informed of all relevant terms, including the cash price, periodic payments, total purchase price, and other applicable charges or fees, before they enter into rental-purchase contracts.

> It is further the intent of the Legislature to (a) prohibit unfair or unconscionable conduct toward consumers in connection with rental-purchase transactions, (b) prohibit unfair contract terms, including unreasonable charges, (c) prevent the forfeiture of contract rights by consumers, (d) provide a right of reinstatement and a reasonable formula for the exercise of purchase option rights under a rental-purchase contract, (e) provide reasonable

63

Class Action Complaint – Case No.

requirements for the servicing, repair, and replacement of improperly functioning rental property, and (f) cover rental-purchase transactions under existing laws, including laws governing debt collection, cosigners, home solicitation contracts, and warranties. This title shall be liberally construed to achieve its remedial objectives.

229.    The Karnette Act "provides essentially strict liability for a defendant's failure to provide certain information or for various unlawful practices arising from a rental-purchase agreement." *Towns v. W. Creek Fin., Inc.*, No. 2:22-CV-01757-DJC-AC, 2023 WL 7490007, at *3 (E.D. Cal. Nov. 13, 2023).

230.    Defendants' paid promotions and sponsored content are each an "advertisement" as defined under the Karnette Act. Cal. Civ. Code § 1812.622(a).

231.    Defendants are both "lessors" as defined under the Karnette Act as they are an entity that provide personal property for use by consumers under a rental-purchase agreement. Cal. Civ. Code § 1812.622(c).

232.    The leased PCs are a "computer system" as defined under the Karnette Act. Cal. Civ. Code § 1812.622(j).

233.    The Karnette Act defines the "lessor's cost" as the actual cost of the goods from a supplier, including freight costs.

234.    The Karnette Act ensures that lessors "shall not engage in any unfair, unlawful, or deceptive conduct or make any untrue or misleading statement in connection with a rental-purchase agreement." Cal. Civ. Code § 1812.639.

235.    Defendants violated Cal. Civ. Code § 1812.639 by misleading consumers as to the goods they received, materially misstating the functionality and quality of leased goods, and so frequently changing product specifications that a consumer could not reasonably be meaningfully informed as to the goods leased. Defendants repeatedly advertised that consumers had a right to

own Program PCs. By contrast, Defendants' sign-in wrap terms state that the "Operator [NZXT] may, but is not required to, extend [Lessee] an option to purchase their Rental Device." Defendants' statements regarding a rental-purchase agreement were unfair, unlawful, and misleading, in violation of the Karnette Act.

236.    The Karnette Act requires that Lessors provide Lessees a single document that sets forth all of the agreements, rights, and obligations of each party with respect to the agreement and including, (1) the minimum period and duration of the agreement, (2) an accurate description of the property, (3) the cash price of the property subject to the agreement, (4) the number of payments and total cost of acquiring ownership, (5) the consumer's right to acquire ownership before the end of the period, and (6) a specifically enumerated notice. Cal. Civ. Code § 1812.623.

237.    Defendants violated Cal. Civ. Code § 1812.623 by failing to set forth in one single document statutorily mandated disclosures and all agreements between Defendants and each consumer with respect to the rights and obligations of each party.

238.    California further requires that any advertisement for a rental-purchase agreement conspicuously states (1) the amount of payment, (2) that the agreement is a rental-purchase agreement, (3) that ownership is not acquired until all necessary payments have been made, and (4) the number of payments necessary to acquire ownership. Cal. Civ. Code § 1812.630. Defendants violated Cal. Civ. Code § 1812.630 by failing to conspicuously disclose that the agreement was a rental-purchase agreement and associated mandatory disclosures.

239.    California has created statutory maximums for the total amount paid by a Lessor of specific goods. A rental-purchase agreement may not exceed 1.65 times the Lessor's Cost of a Computer System. Cal. Civ. Code § 1812.644.

Class Action Complaint – Case No.

240.    Defendants' agreements with Plaintiff and the Class far exceeded the statutory maximum allowed under California Law. Defendants advertised that after two years of payments, a lessee may purchase an upgraded PC based on the lessee's prior payments. Defendants charged Plaintiff $269 per month, or $6,456.00 over a two-year period. NZXT advertises the Player Three Prime at $3,399.00, which is presumably greater than the Lessor's Cost. Defendants charged Plaintiff and the Class in excess of 1.65 times the Lessor's Cost of the goods, in violation of Cal. Civ Code § 1812.644(b).

241.    Defendants willfully and intentionally entered into usurious transactions with Plaintiff and the California Subclass.

242.    Defendants' acts were willful, malicious, oppressive, and in conscious disregard of the rights of Plaintiffs and the Class members, entitling Plaintiffs and the Class members to an award of punitive damages, in an amount to be proved at trial.

243.    Plaintiff and the Class are entitled to recover all of the actual damages, twenty-five percent the cost of full rent-to-own payments, reasonable attorney's fees, exemplary damages, and equitable relief as the Court deems proper. Cal. Civ. Code § 1812.636.

## **COUNT SEVEN**

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
### CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*

(On Behalf of California Plaintiff and the California Subclass)

244.    Plaintiff Steven Zou ("Plaintiff" for purposes of this Count"), individually and on behalf of the California Subclass, realleges and incorporates by reference paragraphs 1-168 as if fully set forth herein.

245.    Defendants' conduct as alleged herein violates California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq., which makes it unlawful for a business to make,

disseminate, or cause to be made or disseminated to the public "any statement, concerning … personal property … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.* § 17500.

246.    The Flex PCs at issue are "personal property" within the meaning of the FAL.

247.    Any express or implied representation, material omission of information, or failure to correct a past material misrepresentation or omission regarding the specifications, qualities, value, or parameters of Program PCs or the Flex Program is a "statement[] concerning personal property" within the meaning of the FAL.

248.    Defendants violated the FAL by making, disseminating, and causing to be made or disseminated to the public statements about the specifications, qualities, and parameters of Program PCs and the Flex Program that were "untrue or misleading" within the meaning of the FAL.

249.    Defendants failed to disclose accurate information regarding Program PCs and the Flex Program generally. Defendants made, disseminated, or caused to be made or disseminated untrue or misleading public statements about Program PCs and the Flex Program in numerous forums, including but not limited to NZXT's website, various social media channels on Instagram, Facebook, YouTube, and TikTok. Defendants and their agents falsely stated that there were "no strings attached" and the Program involved "no contracts" and included "no cancellation fees." Defendants through their agents falsely stated consumers would "own" their Program PC implicating a Rent-to-Own agreement. Defendants intentionally misrepresented and concealed material facts regarding the components, functionality, and qualities of Program PCs.

Class Action Complaint – Case No.

250.    Defendants knew or, by the exercise of reasonable care, should have known that each of those statements was untrue, misleading, and likely to deceive the public at or near the time it was made or disseminated, and at all times thereafter.

251.    Defendants themselves admitted that their own marketing and sponsored marketing did not accurately reflect the details of Program PCs or the Flex Program, and that their advertising communicated falsehoods including that consumers would "own" the Program PC.

252.    As a result of Defendants' FAL violations and the harm caused thereby, Plaintiffs and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Defendants from engaging in its past and ongoing acts, omissions, and conduct that violate the FAL; (b) restitution of the full value of all monies and other consideration that Plaintiffs and Class members paid Defendants for the purchase or lease of Program PCs, including any reduced value of Plaintiffs' and Class members' PCs and disgorgement of the profits Defendants derived from their wrongful conduct; and (c) an award of reasonable attorneys' fees under Cal. Code Civ. Proc. § 1021.5.

## **COUNT EIGHT**

VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
CAL. BUS. & PROF. CODE §§ 1750, *ET SEQ*.

(On Behalf of the California Subclass)

253.    Plaintiff Steven Zou ("Plaintiff" for purposes of this Count"), resident of Los Angeles, California, individually and on behalf of the California Subclass, realleges and incorporates by reference paragraphs 1-168 as if fully set forth herein.

254.    California's Consumer Legal Remedies Act (the "CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices" in connection with the sale or lease of goods. Cal. Civ. Code § 1770.

Class Action Complaint – Case No.

255.    The CLRA is to be liberally construed and applied to protect consumers against unfair and deceptive business practices. Cal. Civ. Code § 1760.

256.    Plaintiff and each California Subclass member is a "consumer," as defined in Cal. Civ. Code § 1761(d).

257.    The leased PCs are "goods," as defined in Cal. Civ. Code § 1761(a).

258.    Defendants are both a "person" as defined in Cal. Civ. Code § 1761(c).

259.    Plaintiff and each proposed Subclass member's lease of Defendants' products constituted a "transaction" as defined in Cal. Civ. Code § 1761(e).

260.    Defendants' actions were unfair, unlawful, and deceptive under the CLRA. Defendants made false representations about the Program, Defendants promised PCs that met specific performance standards and included specific components while delivered PCs did not meet these performance standards and did not contain advertised components. Cal. Civ. Code § 1770(a)(7).

261.    Defendants' actions were unfair, unlawful, and deceptive under the CLRA as Defendants fraudulently advertised their Program and fraudulently advertised that the associated PCs would contain certain components, functionality, and qualities, but intended to lease to consumers a PC different than what was advertised. Cal. Civ. Code § 1770(a)(9).

262.    Defendants' actions were unfair, unlawful, and deceptive under the CLRA as Defendants promised that Plaintiffs and the California Subclass Members own, or have the right to own, the PCs after a period, when the Fragile contract stated that the right to own the PC is at the discretion of the Program Operator. Cal. Civ. Code § 1770(a)(14).

Class Action Complaint – Case No.

263.    Defendants' actions were unfair, unlawful, and deceptive under the CLRA as Defendants inserted unconscionable provisions in the Program contract. Cal. Civ. Code § 1770(a)(14).

264.    Defendants' fraudulently deceived Plaintiff and the California Subclass by representing that their products and services have certain characteristics, benefits, and qualities, which they do not have. In doing so, Defendants intentionally misrepresented and concealed material facts from Plaintiff and the California Subclass. Defendants falsely advertised their Program and that the leased PCs had higher quality components than those that were ultimately delivered. Defendants issued such vague, unilateral, and frequent changes to their product offerings that no consumer could reasonably be expected to understand the contents of transaction. These misrepresentations and concealments were committed with the intention of deceiving Plaintiff and the California Subclass and depriving them of their legal rights and money.

265.    Defendants' claims about their products and services led and continues to lead consumers to reasonably believe that Defendants' Program permitted Plaintiff and the California Subclass to a have a right of ownership over the PCs and that Defendants have accurately advertised components, features, and qualities of these PCs, when Defendants intentionally misrepresented their Flex PCs and the Program.

266.    Plaintiff and the California Subclass have suffered injury-in-fact as a result of and in reliance upon Defendants' false representations and have lost money as a result of Defendants' unfair, unlawful, and fraudulent conduct. Plaintiff and the California Subclass would not have leased Defendants' Flex PCs, or would have paid significantly less for them, had they known that they would receive a substantially inferior PC, that they may not own the PC after a period of payments, or that they would have to pay fees and charges that were misrepresented or omitted.

70

Class Action Complaint – Case No.

267.    Defendants' actions as described herein were done with conscious disregard for Plaintiff and the rights of California Subclass Members, and Defendants were wanton and malicious in their concealment of the same.

268.    Plaintiff and California Subclass Members seek all monetary and nonmonetary relief allowed by law including restitution, reasonable attorneys' fees and costs under California Code of Civil Procedures § 1021.5, and injunctive relief under the CLRA pursuant to Cal. Civ. Code § 1782(d) and other appropriate equitable relief.

## COUNT NINE

VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*

(On Behalf of the California Subclass)

269.    Plaintiff Steven Zou ("Plaintiff" for purposes of this Count"), individually and on behalf of the California Subclass, realleges and incorporates by reference paragraphs 1-168 as if fully set forth herein.

270.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, prohibits, *inter alia*, "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

271.    Defendants are each a "person" as defined by Cal. Bus. & Prof. Code § 17201.

272.    Defendants violated the UCL by engaging in business acts and practices which are unlawful, unconscionable, and unfair under the UCL.

273.    Defendants' acts and practices are unlawful because Defendants violated and continue to violate RICO and California common law and statutory laws including, but not limited to the CLRA, FAL, and the Karnette Rental Purchase Act.

Class Action Complaint – Case No.

274.    Defendants engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the UCL by:

a.    Failing to disclose accurate information regarding the products being leased to Plaintiff and the California Subclass;

b.    Issuing vague, unilateral, and frequent changes to the NZXT website about the specifications of the products being rented under the Flex Program such that no consumer could reasonably understand the benefit of the bargain;

c.    Falsely advertising or marketing the Flex Program while knowing that the Program should not have been marketed in such manner;

d.    Providing loans for a Rent-to-Own program at usurious rates far in excess of California law; and

e.    Creating unclear contracts with consumers, and breaching these contracts.

275.    Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and California Subclass Members' rights, because Defendants intentionally misrepresented and concealed material facts regarding the Program and the components, functionality, and qualities of Defendants' Flex PCs.

276.    The fact that Defendants intentionally misrepresented and concealed these facts is material to Plaintiff and California Subclass Members. This is information that reasonable consumers consider important when choosing to purchase or lease a PC.

277.    Plaintiff and California Subclass Members were deceived and/or could reasonably be expected to be deceived to their detriment by Defendants' material misrepresentations and concealments regarding Defendants' Program and the components, functionality, and qualities the Flex PCs.

278.    In the course of their business, Defendants repeatedly and regularly engaged in the unlawful, unconscionable, and unfair acts or practices, which caused serious harm to consumers, including Plaintiff and California Subclass Members.

Class Action Complaint – Case No.

279.    As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiffs and California Subclass Members have suffered and will continue to suffer injury, including, but not limited to (1) reduced operational capacity and functionality of the leased PCs, (2) inability to utilize the leased PCs in accordance with Defendants' advertised specifications, (3) charges in excess of the value of the leased PC, and (4) the imposition and collection of illegal charges under the Karnette Rental Purchase Act.

280.    Plaintiff and California Subclass members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unlawful, unfair, and unconscionable practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief as the Court deems appropriate.

## **COUNT TEN**

### BREACH OF CONTRACT

#### (On Behalf of the California Subclass)

281.    Plaintiff Zou ("Plaintiff" for purposes of this Count), individually and on behalf of the California Subclass, incorporates by reference paragraphs 1-168, as if fully set forth herein.

282.    Parties entered into a valid and enforceable contract under which Defendants expressly agreed to provide Plaintiff and the California State Subclass with gaming PCs of a given quality, that included specific components, and that meet specific functionality and performance standards.

283.    Defendants intentionally and materially breached these contracts. Defendants delivered gaming PCs with substituted components with substantially inferior alternatives and Plaintiff and California Subclass members received PCs with substantially diminished

Class Action Complaint – Case No.

functionality. Defendants' unilateral substitution represents a material deviation from Defendants' express promises and constitutes a breach of contract.

284.    Defendants, *inter alia*, further promised that Plaintiff would own the PCs after a period of payments, ensuring Plaintiff the Program was rent-to-own. Defendants obscured and reneged on this promise representing a material deviation from Defendants' express promises, which constitutes a breach of contract.

Accordingly, Plaintiff and California Subclass members have been injured as a result of Defendants' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial.

## **COUNT ELEVEN**

VIOLATION OF NEW YORK'S GENERAL BUSINESS LAWS
N.Y. GEN BUS. LAW §§ 349; 350.

(On Behalf of the New York Subclass)

285.    The New York Plaintiff, Jonathan Moulton, identified above ("Plaintiff" for purposes of this Count), individually and on behalf of the New York Subclass, incorporate by reference paragraphs 1-168, as if fully set forth herein.

286.    New York has declared as unlawful all false advertising or deceptive acts or practices in the conduct of any business, trade, commerce, service. N.Y. Gen. Bus. Law § 349; N.Y. Gen. Bus. Law § 350.

287.    Defendants engaged in false advertising or deceptive acts or practices in the conduct of their business, trade, and commerce, in violation of N.Y. Gen. Bus. Law §§ 349-50. Defendants' deceptive acts and practices include:

   a.   Failing to disclose accurate information regarding the Program and the products being leased to Plaintiff and the New York Subclass;

   b.   Misrepresenting the rights of ownership related to the Flex PCs;

Class Action Complaint – Case No.

c.  Misrepresenting the rights and obligations created by Defendants' Program;

d.  Issuing vague, unilateral, and frequent changes to the NZXT website about the Program and the specifications of the products being leased under the Program such that no consumer could reasonably understand the benefit of the bargain;

e.  Falsely advertising or marketing the Flex Program while knowing that the Program should not have been marketed in such manner; and

f.  Creating unclear contracts with consumers, and breaching these contracts.

288.  Defendants' acts, practices, concealments, and material omissions are false advertising and constitute fraud, deception, and unfair commercial practices, and are in violation of § 349 and § 350 of New York's General Business Law.

289.  Defendants acted intentionally, knowingly, willfully, and maliciously to violate N.Y. Gen. Bus. Law §§ 349 and 350 or acted with reckless disregard for the rights of Plaintiff and New York Subclass Members.

290.  The fact that Defendants falsely represented, materially omitted, or concealed the components within Defendants' Flex PCs as well as their function and quality, is material to consumers because this is a fact that reasonable consumers consider when choosing to purchase or lease a PC.

291.  Defendants' intentional actions are deceptive. Defendants' conduct is likely to mislead consumers and the public, including Plaintiff and the New York Subclass, by making them falsely believe that consumers will receive a high-end PC with specified components and qualities, when consumers actually received a much lower quality PC and were charged unclear, variable, and uncertain rates for the leased PCs. Defendants' conduct is likely to mislead the public regarding the right of ownership over the Flex PCs and the terms of the Program. Defendants' conduct is likely to mislead the public regarding the rights and obligations created by Defendants' Program.

Class Action Complaint – Case No.

292.    Defendants' false, misleading, and deceptive acts and practices have directly, foreseeably, and proximately caused damages to Plaintiff and New York Subclass Members, and ascertainable losses of money or property as a result of Defendants' deceptive acts and practices.

293.    The public interest and consumers at large were harmed by Defendants' deceptive and unlawful acts, which affected thousands of New York residents.

294.    Plaintiff and New York Subclass Members seek all monetary and non-monetary relief available under N.Y. Gen. Bus. Law §§ 349(h) and 350-e, including damages, statutory damages, treble damages, injunctive relief, costs and attorneys' fees.

## COUNT TWELVE

BREACH OF CONTRACT

(On Behalf of the New York Subclass)

295.    Plaintiff Moulton ("Plaintiff" for purposes of this Count), individually and on behalf of the New York Subclass, incorporates by reference paragraphs 1-168, as if fully set forth herein.

296.    Parties entered into a valid and enforceable contract under which Defendants expressly agreed to provide Plaintiff and the New York Subclass with gaming PCs of a given quality, that included specific components, and that meet specific functionality and performance standards.

297.    Defendants intentionally and materially breached these contracts. Defendants delivered gaming PCs with substituted components with substantially inferior alternatives and Plaintiff and New York Subclass members received PCs with substantially diminished functionality. Defendants' unilateral substitution represents a material deviation from Defendants' express promises and constitutes a breach of contract.

Class Action Complaint – Case No.

298.    Defendants, *inter alia*, further promised that Plaintiff would own the PCs after a period of payments, ensuring Plaintiff the Program was rent-to-own. Defendants obscured and reneged on this promise representing a material deviation from Defendants' express promises, which constitutes a breach of contract.

299.    Accordingly, Plaintiff and New York Subclass members have been injured as a result of Defendants' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial.

## COUNT THIRTEEN

### VIOLATION OF WASHINGTON'S CONSUMER PROTECTION ACT
Wash. Rev. Code §§ 19.86, *et seq.*

(On Behalf of the Washington Subclass)

300.    The Plaintiff Jacob Burns ("Plaintiff" for purposes of this Count), individually and on behalf of the Washington Subclass, incorporates by reference paragraphs 1-168, as if fully set forth herein.

301.    The Washington Consumer Protection Act ("Washington CPA") declares that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. Wash. Rev. Code § 19.86.020.

302.    Defendants are each a "person" as defined by Wash. Rev. Code § 19.86.010(1), which includes corporations, trusts, unincorporated associations and partnerships.

303.    Defendants engage in "trade" or "commerce" as defined by Wash. Rev. Code § 19.86.010(2), which includes the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington. Defendants have engaged in unfair practices by:

Class Action Complaint – Case No.

a. Failing to disclose accurate information regarding the products being leased to Plaintiff and the Washington Subclass;

b. Misrepresenting the rights of ownership related to the Flex PCs;

c. Misrepresenting the rights and obligations created by Defendants' Program;

d. Issuing vague, unilateral, and frequent changes to the NZXT website about the Program and the specifications of the products being leased under the Program such that no consumer could reasonably understand the benefit of the bargain;

e. Falsely advertising or marketing the Flex Program while knowing that the Program should not have been marketed in such manner; and

f. Creating unclear contracts with consumers, and breaching these contracts.

304.    Defendants acted intentionally, willfully, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiff's and Class Members' rights and harmed the public interest, because Defendants deliberately misrepresented the attributes and specifications of their products, which distorts and undermines market integrity and confidence.

305.    The fact that Defendants materially misrepresented, omitted, or concealed information about the Program and the components within Defendants' Flex PCs as well as their function and quality, is material to consumers because these are facts that reasonable consumers consider when choosing to purchase or lease a PC.

306.    Plaintiff and Washington Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the Program and the functionality of Defendants' Flex PCs to their detriment.

307.    Plaintiff and Washington Subclass Members could not have reasonably avoided Defendants' practices as described herein.

308.    Plaintiff and Washington Subclass Members have derived no benefit from Defendants' material misrepresentations and false statements, and there are no countervailing benefits to them or to competition resulting from Defendants' actions. Defendants' deceptive and

Class Action Complaint – Case No.

unfair acts and practices affect the public interest as they have had the capacity to injure and have injured other persons.

309.   Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's desire to lease these products in the future.

310.   Pursuant to Wash. Rev. Code § 19.86.090 Plaintiff and Washington Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, and reasonable attorney's fees.

## COUNT FOURTEEN

### BREACH OF CONTRACT

(On Behalf of the Washington Subclass)

311.   Plaintiff Burns ("Plaintiff" for purposes of this Count), individually and on behalf of the Washington Subclass, incorporates by reference paragraphs 1-168, as if fully set forth herein.

312.   Parties entered into a valid and enforceable contract under which Defendants expressly agreed to provide Plaintiff and the Washington Subclass with gaming PCs of a given quality, that included specific components, and that meet specific functionality and performance standards.

313.   Defendants intentionally and materially breached these contracts. Defendants delivered gaming PCs with substituted components with substantially inferior alternatives and Plaintiff and Washington Subclass members received PCs with substantially diminished functionality. Defendants' unilateral substitution represents a material deviation from Defendants' express promises and constitutes a breach of contract.

314.   Defendants, *inter alia*, further promised that Plaintiff would own the PCs after a period of payments, ensuring Plaintiff the Program was rent-to-own. Defendants obscured and

Class Action Complaint – Case No.

reneged on this promise representing a material deviation from Defendants' express promises, which constitutes a breach of contract.

315.    Accordingly, Plaintiff and Washington Subclass members have been injured as a result of Defendants' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a)    For an Order certifying this action as a Class Action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

b)    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein;

c)    For an award of actual damages, treble damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties in an amount to be determined, as allowable by law;

d)    For disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

e)    For an award of punitive damages, as allowable by law;

f)    For an award of attorneys' fees and expenses, as allowable by law;

g)    Pre- and post-judgment interest on any amounts awarded; and

h)    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Class Action Complaint – Case No.

Dated: August 5, 2025

**COTCHETT, PITRE & MCCARTHY, LLP**
By: */s/ Thomas E. Loeser*
Joseph W. Cotchett, Cal. Bar No. 36324
Thomas E. Loeser, Cal. Bar No. 202724
840 Malcom Road
Burlingame, CA 94010
Tel: 650-697-6000
Fax: 650-697-0577
jcotchett@cpmlegal.com
tloeser@cpmlegal.com

Karin B. Swope (*pro hac vice* to be filed)
Jacob M. Alhadeff (*pro hac vice* to be filed)
1809 7th Ave., Ste. 1610
Seattle, WA 98101
Tel: (206) 802-1272
Fax: (206) 299-4184
kswope@cpmlegal.com
jalhadeff@cpmlegal.com

**LEVI & KORSINSKY, LLP**
Mark S. Reich (*pro hac vice* to be filed)
Michael N. Pollack (*pro hac vice* to be filed)
33 Whitehall Street, Floor 17
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: mpollack@zlk.com

*Counsel for Plaintiffs*

Class Action Complaint – Case No.